The People of the State of Illinois, Plaintiff-Appellee, *v.* Craig Springfield, Defendant-Appellant.

(No. 61275;

First District (3rd Division)—November 6, 1975.

James J. Doherty, Public Defender, of Chicago (Suzanne M. Xinos, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Donald M. Devlin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Craig Springfield, was charged with the murder of Alice Robinson. After a bench trial in the circuit court of Cook County, he was convicted of that charge and sentenced to a term of 14 to 20 years. On appeal, defendant contends that he was not proved guilty of murder beyond a reasonable doubt; that the testimony of the coroner's physician deprived him of a fair trial; and that the conduct of the prosecutor was such that it deprived defendant of due process, thereby requiring a new trial. The facts follow.

During the late afternoon of November 3, 1972, Alice Robinson died from a. severe laceration of the liver and the accompanying internal bleeding.

Victor Robinson, decedent's son, testified that on the morning in question he had received a telephone call from his mother who was living at defendant's apartment. Decedent appeared to be frightened and asked Robinson to take her away. That afternoon Robinson went to the apartment with two of his friends and was met at the door by his mother. He could tell she had been drinking. The decedent reiterated her desire to leave and the three boys began to collect her belongings. An argument between defendant and decedent ensued.

When the four attempted to leave the apartment, Robinson was assaulted from behind by defendant as he stepped through the door. Defendant waved a butcher knife at him, cutting his jacket, and pulled the decedent into the apartment. Defendant then closed the door. The police knocked on the door and identified themselves upon inquiry from within. After approximately 20 minutes, an elderly man emerged with the information that defendant had taken decedent out the back way. The police officers and Robinson drove around the neighborhood attempting to find the pair without success. Robinson did not see his mother again until that evening at the hospital after she had died.

Charlene Figgs, a neighbor who lived across the alley, provided an eyewitness account of the occurrences which led to the decedent's death. Figgs testified that shortly before 4:30 in the afternoon she heard a knock on her door accompanied by a female voice crying, "Help, help me Charlene." Upon opening the door, Figgs saw defendant push the decedent into the apartment and immediately knock her to the floor. De-

cedent was bleeding, and defendant continued to punch her with his fists. Figgs demanded the defendant leave. He agreed to leave, but repeatedly kicked the decedent over much of her body. As decedent lay on her back on the wooden floor, defendant stomped down on her stomach with his heel. While defendant continued the brutal beating, the decedent kept advising him that she loved him. Shortly thereafter the decedent collapsed. Defendant picked her up and placed her on the bed, stating to Figgs that decedent had blacked out. Figgs observed three deep breaths and commented that the decedent was dead. Defendant then took the body back into the living room and placed it in a chair.

Figgs further testified that when the police arrived, both she and defendant told them that the decedent had come alone to Figgs' apartment. She had fallen down the stairs, crawled back up to the door seeking aid, and had died after Figgs went to summon defendant. Figgs also testified that two days later defendant phoned asking for money and telling her that he was going to run. She then called the police and related her account of the beating. On cross-examination, Figgs disclosed that she had heard of threats on defendant's life made by the decedent's relatives. She had told someone that defendant would probably be safer in prison than on the streets.

The autopsy report on the decedent was filed over the signature of Dr. Edward Shalgos of the Cook County Coroner's office. Dr. Shalgos was the pathologist who had supervised the autopsy. In his opinion, death was caused by a laceration of the liver, with major internal bleeding "of the rather broadly applied trauma to the front part of the high anterior abdominal wall." The origin of the injury causing death was a blunt, heavy trauma applied to the belly, compressing of the liver between the decedent's backbone and the applied trauma, causing the liver to split open. The injury was compatible with a heavy stomping origin, and was totally incompatible with an origin such as falling down stairs.

On cross-examination, Dr. Shalgos testified that the actual autopsy had been performed under his guidance and supervision by a doctor of Thai origin and training. Dr. Shalgos was 15 feet away, and personally observed the organ changes and wounds of the decedent. In response to a question by defense counsel as to whether the cause of death and injury could have come from falling over a blunt object, Dr. Shalgos replied that anything was possible.

Investigator Lucius Moore of the Chicago Police Department testified that he took Charlene Figgs' statement from her. He also testified as to receiving telephone calls from defendant and making appointments to discuss the incident. When defendant failed to appear, a warrant for his

arrest was issued. Officer Albert Jordan of the Chicago Police Department testified that defendant was located in Mississippi three weeks after decedent's death.

Faye Robinson, daughter of the decedent, testified that her mother had moved out on defendant before. The daughter testified that her mother gave as a reason that defendant would "jump on her."

Officer Thomas Wollschlager of the Chicago Police Department testified for the defense that he and his partner were called to the Figgs' apartment and were shown the body of deceased. Figgs informed the officer that the death was accidental, presumably occurring from a fall down the stairs outside her door.

Obie Holly, defendant's uncle, testified that he had met Figgs during defendant's trial and that she had telephoned him repeatedly thereafter. Figgs expressed her concern for defendant, saying that she had once slept with him. She further stated that she wanted to get a job so as to be able to buy defendant a car.

Defendant testified in his own behalf, denying that he had struck or kicked deceased on the day of her death. He stated that she had been drinking heavily, and that he had sent her across the alley to Figgs' apartment. Shortly thereafter, Figgs appeared and told him the decedent had fallen down some stairs and had been badly injured. Defendant ran across the alley and found decedent sprawled in a chair. Decedent told defendant that she had accidentally fallen down the stairs, and she then died. Defendant further testified that earlier Victor Robinson and his friends had attempted to force the decedent to leave the apartment. As she had no such intention, she pushed them out of the door and locked them out. After decedent's death, defendant's life had been threatened and he had been forced to flee to Mississippi for survival. He also testified that Figgs told him she had been coerced into making statements against him.

On cross-examination, defendant described his relationship with decedent as a "boy-meets-girl" affair and denied ever having any trouble with her. He testified that she twice had him arrested for stealing her car, but he denied any knowledge of a battery complaint filed against him by decedent.

James Romanak, an attorney, testified for the defense that he was present during the taking of a statement from Charlene Figgs. He testified that Figgs had demonstrated how defendant had stomped on decedent's stomach by raising herself up on the balls of her feet and coming down on her heels.

In rebuttal, the State called John Dawkins, a former coworker of defendant who testified to having seen defendant strike deceased. The

witness also testified that defendant's reputation for truth and veracity was bad.

Charlene Figgs testified in rebuttal and denied ever telling Obie Holly she had slept with defendant. The court admitted into evidence People's Exhibits 10, 11, and 12; a battery complaint filed by the decedent; an arrest warrant for the defendant's arrest for the battery of decedent; a bond slip signed by defendant; and a half-sheet, revealing an ex-parte judgment against defendant for the crime of battery. The trial court limited the admission of the above exhibits to the issue of whether or not defendant had knowledge that a complaint had been filed against him by the decedent for battery and for no other purpose.

Defendant's first contention is that the State failed to prove him guilty of murder beyond a reasonable doubt.

■■ It is true that Figgs first gave the police a conflicting statement, contending that the death was accidental. However, this inconsistent statement only has the effect of impeaching the credibility of the witness against whom it is offered. (*People v. Collins* (1971), 49 Ill.2d 179, 274 N.E.2d 77.) Notwithstanding the impeaching evidence, the trier of fact may accept the credibility of the witness. (*People v. Harter* (1967), 86 Ill.App.2d 461, 230 N.E.2d 15.) Moreover Figgs' testimony received strong support from the pathologist. When she, the sole eyewitness to the murder, gave her second statement to the police implicating defendant in the crime, there is no evidence that she had any knowledge of the autopsy findings. Yet her later statements to the police and to defense counsel were entirely consistent with the findings of Dr. Shalgos. Her observations so closely paralleled the pathologist's findings upon internal examination of the body that the trial judge cogently concluded that there was no possible way Figgs could have fabricated a beating unless in fact, such a beating took place.

■■ It is well settled that the findings of the trier of fact will not be disturbed through the substitution of a reviewing court's own conclusions unless the proof is so unsatisfactory as to justify a reasonable doubt of defendant's guilt. (*People v. Taylor* (1975), 28 Ill.App.3d 186, 328 N.E.2d 325.) The State presented sufficient evidence to prove defendant guilty of murder beyond a reasonable doubt.

Defendant's second contention is that the testimony of Dr. Shalgos deprived defendant of due process and a fair trial. Several arguments have been made in support of this contention. None have merit.

■■ Defendant urges that certain of the doctor's responses during cross-examination were in equivocation of his position taken on direct examination. After the doctor had testified that the cause of death was a severe laceration of the liver which was most compatible to a stomping

of the belly, defense counsel attempted to extract an admission that the damage could have resulted from a fall down the stairs. Although the doctor refused to waver from his position, defense counsel finally inquired if this was not at least a possibility. The doctor replied that "anything is possible." Later, the doctor stated that "he could not see how," but that it was an "infinitesimal possibility." These were not equivocations. The statements did not impair the doctor's testimony, and the argument does not merit serious consideration.

■■ Defendant also maintains that he was deprived of the right of confrontation and to cross-examine because Dr. Shalgos did not perform the autopsy or prepare the report. The argument is factually without merit since the doctor not only supervised the autopsy but also personally observed the significant organ changes in the body. The doctor revealed a detailed and independent knowledge of the cause of death and the extent of the injury of the deceased. Defendant was given the opportunity to cross-examine the doctor and took advantage of this opportunity.

Defendant also contends that the doctor's testimony materially contradicted the written report. The second page of the protocol lists "ruptures" of the liver as the cause of death while the doctor testified to only one rupture. Although this apparent conflict would not of itself discredit the doctor's testimony, the problem seems to have been created by a typographical error. In the first page of the protocol, under the signature of Dr. Shalgos, the cause of death is listed as "traumatic rupture." In making this argument, defendant also relies heavily on the fact that the protocol reads "stumble-fall compatibility" as to the injuries to the hands, patella and ankle. This in no way relates to the cause of death and can be dismissed as being immaterial. Moreover, Dr. Shalgos accounted for this apparent discrepancy by explaining that the doctor who prepared the drafts of the report was from a foreign country and was not completely familiar with the English language. No error was committed in the introduction or presentation of Dr. Shalgos' testimony.

Defendant's next contention is that the conduct of the prosecutor in attempting to introduce improper evidence and in making improper remarks was so prejudicial as to have denied defendant a fair trial. Defendant cites several examples of such misconduct, but stresses four specific instances. We will confine ourselves to a discussion of those four incidents.

Officer Laurence Roberts of the Chicago Police Department was called as a witness by the State. The officer testified that on May 25, 1972, he answered a call at decedent's apartment. He noticed that the left cheek of the decedent was inflamed, presumably from a blow by defendant. He further stated that he had informed defendant of a battery warrant

which existed at the time. The trial court struck the officer's entire testimony.

A trial court, sitting as a trier of fact in a criminal case, is presumed to consider only competent evidence before it. (*People v. Hayes* (1973), 15 Ill.App.3d 851, 305 N.E.2d 283.) Since the judge did not utilize this testimony in reaching his decision, defendant has failed to show any prejudicial effect.

■■ The State also introduced a number of exhibits relating to a battery complaint filed by the decedent against defendant. The judge permitted the introduction of this evidence to show that defendant, contrary to his testimony, did in fact have knowledge of a battery complaint brought against him. The judge specifically limited the application of this evidence to rebutting an assertion of defendant and did not use the evidence as indicia of guilt or of prior crimes. We believe the exhibits were properly admitted for this limited purpose. Moreover, even if inadmissibility is assumed, this court has ruled that a defendant is not prejudiced where he fails to show that the trial court sitting as a trier of fact in any way relied upon inadmissible evidence concerning a past arrest which did not result in a conviction. (*People v. Jackson* (1968), 95 Ill.App.2d 193, 238 N.E.2d 196.) Therefore the admission of these exhibits could not amount to reversible error.

■■ Defendant next alleges error in the admission of testimony concerning a specific prior act of misconduct as impeachment of his reputation. On direct examination, John Dawkins had testified that defendant's reputation for truth and veracity in the community was bad. On cross-examination, defense counsel asked Dawkins whether or not he had told counsel that the defendant had tried to take $15 from him. Although on redirect examination, the State attempted to inquire about this incident, the trial court sustained defense objections to almost all of the State's questions. Since it was defendant who introduced the specific prior act of misconduct, he cannot now complain that it resulted in prejudicial error.

■■ Defendant finally maintains that the testimony of the decedent's daughter as to defendant's conduct prior to the date of decedent's death was hearsay, and so inflammatory as to prejudice the trier of fact. The daughter testified that her mother informed her she moved out on defendant when he "jumped on her." We need not reach the evidentiary question, as the introduction of this evidence in a bench trial could not amount to reversible error.

■■ Taken as a whole, the conduct of the prosecutor in the present case was less than desirable. However, this conduct, even when regarded cumulatively, is insufficient to cause a reversal. The trial court is not

only confined to the consideration of competent evidence in ruling, but will also disregard the improper remarks and arguments of counsel. (*People v. Grodkiewicz* (1959), 16 Ill.2d 192, 157 N.E.2d 16.) It is necessary that defendant point out where in the record it appears the trial court either considered improper evidence or was misled by improper remarks, in order that the court's ruling be overturned. (See *People v. Ford* (1974), 21 Ill.App.3d 242, 315 N.E.2d 87.) This, defendant has failed to do. Therefore, defendant's contention that the prosecutor's actions and remarks resulted in prejudicial error cannot be accepted.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

DEMPSEY and MEJDA, JJ., concur.