THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD BOONE *et al.*, Defendants-Appellants.

First District (2nd Division)  Nos. 1—85—1915, 1—85—2094, 1—85—2148 through 1—85—2150 cons.  .

Opinion filed December 30, 1988.—Rehearing denied March 14, 1989.

100

William P. Murphy and Thomas Peters, both of Chicago, for appellant Albert Tillman.

Paul P. Biebel, Jr., Public Defender, of Chicago (Kathleen M. Pantle, Assistant Public Defender, of counsel), for appellants Donald Boone and Alice Nelson.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Kim A. Novi, and Robert McNamara, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendants Donald Boone, Alice Nelson, and Albert Tillman were charged by indictment with soliciting for a juvenile prostitute (Ill. Rev. Stat. 1983, ch. 38, par. 11—15(1)), indecent liberties with a child (Ill. Rev. Stat. 1983, ch. 38, par. 11—4(a)(3)), pandering (Ill. Rev. Stat. 1983, ch. 38, par. 11—16), and juvenile pimping (Ill. Rev. Stat. 1983, ch. 38, par. 11—19.1(a)). Defendant Boone was tried before a jury and found guilty of all charges. Defendants Alice Nelson and Albert Tillman, tried simultaneously with Boone in a bench trial, were also found guilty of all of the charges. All three defendants appeal their convictions.

The issues on appeal are (1) whether the defendants were proved guilty beyond a reasonable doubt, (2) whether defendants Boone and Nelson were denied a fair trial because of the trial judge's questioning of the witnesses during their testimony, (3) whether defendant Boone was denied a fair trial by reason of certain remarks made by the State in closing argument, (4) whether the trial court erred in considering certain information offered in aggravation at Boone's sentencing hearing, and (5) whether the trial court abused its discretion by

denying defendants' motions for a mistrial.

The State's case consists mainly of the testimony of the four complaining witnesses, who told of a "sex club" run by the defendants wherein young girls, who were wards of the Illinois Department of Children and Family Services (DCFS), were given drugs in exchange for engaging in prostitution, pornography, and other sexual acts. Since the defendants contend that the alleged victims, who admitted to being drug users, gave confused, contradictory testimony that did not merit belief, and inasmuch as defendants charge they were not proved guilty beyond a reasonable doubt, we shall review the testimony of the witnesses in detail.

Donna Clark, the State's first witness, testified that in October of 1982 she was 13 years old, a ward of the State, and living in Touhy House, which is a part of the Mary Bartelme House Placement Center in the City of Chicago. In November of 1982, in the neighborhood of Jarvis and Greenview in Chicago, Clark met a woman named Denise, whom she identified in court as defendant Alice Nelson. Defendant Nelson asked Clark if she wanted to get "high," and when Clark assented, they went to Nelson's apartment, where they smoked marijuana.

Clark testified that she returned to Nelson's apartment in December of 1982 where she met Donald Boone and Albert Tillman. During the month of December when Clark was at Nelson's apartment with another girl, Debbie Ferreri, she was told by Al to go to bed with Nelson. When she refused, Al threw her up against a wall. Ferreri was given drugs, but Clark was not.

In January of 1983, Clark was given pills called "T's" and "Blues" which made her "really high." As a result, she went to bed with defendant Nelson and the two engaged in oral sex. Between January and early May of 1983, Clark saw Nelson on many occasions and had sex with her approximately 15 times. After being threatened by defendant Tillman, Clark had sex with a man she did not know and for which act she received drugs.

Clark also testified that she had sexual intercourse with Tillman several times, and that during February and March of 1983, he arranged for Clark to have sex in various places with different individuals. She gave the money she was paid to Nelson or Tillman and received drugs in return.

Clark testified she met defendant Boone at Nelson's apartment in January of 1983 where she had oral sex with him and received drugs. Several times in the following months Clark again had sexual relations with Boone. In February of 1983, Clark was sent by Boone to a

motel where she engaged in sexual intercourse with two men and one woman. Clark kept $75 of the $115 she received and gave the rest to Nelson.

Clark was photographed undressed and partially undressed by Tillman or Boone; she also witnessed movies being taken of other girls from DCFS homes in the apartment.

On February 8, 1984, while Clark was hospitalized in Des Plaines, where she was being treated for alcohol and drug abuse, she identified defendants Tillman and Boone from a group of photos of men and defendant Nelson from a group of photos of women.

On cross-examination, Clark testified that she began taking drugs when she was 10 or 11 and that she worked as a prostitute for a man named Bill and a man named Chafi. In June 1982, she overdosed on LSD.

The second witness for the State, Norma Jones, testified that she was 13 in May of 1982 and was living at Jarvis House, also a part of the State's Mary Bartelme system. In May or June of 1982, Jones and a housemate, Debbie Ferreri, went to a 7-11 store at Greenview and Jarvis to play video games. Here they met another girl, Angel, and the three of them went to Nelson's apartment. At the apartment, Jones saw defendants Nelson and Boone. All three girls were given marijuana, and Nelson gave Jones a can of beer. Boone then pulled out cocaine and put it on the table at which time the defendants told the girls to "snoot it up" their noses.

On her third or fourth visit to Nelson's apartment, and several times thereafter, Jones witnessed a meeting of a club called "The Ladies" at which she saw about 15 girls, including Donna Clark and Elizabeth Zemola, and at which the girls discussed how well they were doing. During the meeting she asked Nelson how she could get drugs; Jones was told she would have to have sex with a man named James. She went into the bedroom where she saw James and Boone. Jones was given drugs after Boone took pictures of her having sex with James.

In September of 1982, Jones had sex with Boone, and James took pictures, in exchange for which she was given drugs by defendant Nelson. She also testified that Boone took photographs of her and Elizabeth Zemola, who were both nude at the time. Jones went to Nelson's apartment at different times for approximately a year and had intercourse with defendant Boone or James about 25 times. She got drugs two or three times a week.

Jones stated that she never saw defendant Tillman at Nelson's apartment. In November of 1983, she was at the "L" station with Ro-

manda Neeley and Debbie Ferreri where they met defendant Nelson, who showed them nude photos of Jones.

The State's third witness was Elizabeth Zemola, who testified that in July of 1982 she was 13 years old and lived at Mary Bartelme Chase House. She stated that she first went to Nelson's apartment in July of 1982 with Elisha Bonner, where she met defendants Nelson, Tillman, and Boone. Nelson gave her cocaine and marijuana. Zemola testified that she went to Nelson's apartment about 8 to 10 times in July and got "high." In August of 1982, Zemola was told by Nelson that she would have to have sex with men in order to get any more drugs.

She had sex with a man in Nelson's apartment in September of 1982 for which she received drugs. Nelson and Tillman were present in the apartment at the time. Several months later, Zemola witnessed Boone taking nude photos of Norma Jones. When Zemola refused to pose as Boone wanted her, he slapped her around and hit her with a bottle. She then agreed to the pictures. She further testified to having sex with Boone in the apartment.

In March of 1983, Zemola had a conversation with Boone and Tillman at which time Tillman told Zemola she would have to work as a prostitute. Zemola gave the money she earned to Tillman and Boone, and she was given money or drugs. She testified that Boone and Tillman established a quota for her of $200 to $300 a week and that these quotas were discussed at the meetings held at Nelson's apartment. She knew other girls who attended the meetings at the apartment, and she identified Donna Clark, Romanda Neeley, Norma Jones, and a girl named Angel. Also present at the meetings were Nelson, Tillman and sometimes Boone.

Romanda Neeley, the State's fourth witness, testified that she was 14 in May of 1982 and lived at Jarvis House. She met defendant Nelson in front of an apartment house at Greenview and Fargo while she was with another girl named Theresa. Nelson told Neeley to come up to her apartment if Neeley ever wanted to get "high." When Neeley went to the apartment a few weeks later, she saw defendants Nelson, Tillman, and Boone and some other girls there. She used drugs there that day.

On Neeley's fourth or fifth visit to the apartment, defendants Tillman and Boone told her that she would have to have sex with other men and get involved with pictures and movies if she wanted to get "high." Neeley told defendant Nelson that she did not want to get involved, and, after a conversation with Boone and Tillman, Nelson told Neeley that she would have to "mess around" with Nelson. A couple

of days later, Neeley returned to the apartment and had oral sex with Nelson for which she was given drugs and alcohol. For the next year, Neeley continued to have sex with Nelson, and she was given drugs after sex. Neeley also testified that she attended the meetings of the Ladies Club at the apartment. She recognized Donna Clark, Elizabeth Zemola, Norma Jones, Angel Kramer, and Debbie Ferreri. Nelson was always at the meetings; Tillman was there most of the time; Boone was there off and on.

In November of 1983, Mary Ann West, who worked as a social work director and unit director for Mary Bartelme Homes from 1971 to 1984, became aware of a sex club among the wards of the State and called the Chicago police. She questioned the girls at different times and discussed the information she learned about the club from the girls with the police.

Officer Vana, a youth investigator with the Chicago police department, testified that in late November of 1983 he became involved in an investigation of sexual exploitation of juvenile residents of the Mary Bartelme system. He interviewed several residents of the homes in December of 1983, including Norma Jones, who identified a building at 7455 North Greenview as the building where Nelson's apartment was located. Vana testified that he interviewed Louise Marino, the manager of the building at that address and asked her if she knew Denise or Nessie; Marino responded that it was Alice Nelson. Vana further testified as to the identification procedures used by the police department, which consisted for the most part of photographic displays. All four girls who testified identified the defendants from these photo arrays shown to them by the police; they also identified the defendants in court.

Officer Vana also testified regarding a statement made by defendant Nelson after her arrest on February 14, 1984 in which Nelson discussed her sexual relationship with Romanda Neeley. Vana further testified that defendant Boone denied knowing defendants Tillman and Nelson. On February 15, 1984, Officer Vana interviewed defendant Tillman, who told him he knew Boone as Hollywood and that he was a pimp for several young girls who were wards of the State. The record shows that Vana's testimony as to each defendant was introduced and admitted only as to that particular defendant. The record also shows that Nelson's statement was introduced and admitted only as to her.

At the conclusion of the evidence, the jury returned a verdict finding defendant Donald Boone guilty of soliciting for a juvenile prostitute, pandering, indecent liberties with a child, and juvenile pimping.

Subsequently, the trial judge found defendants Nelson and Tillman guilty of the same crimes. Following a sentencing hearing, defendant Boone was sentenced to 14 years; Tillman was sentenced to 12 years, and Nelson was sentenced to seven years.

All three defendants, Boone, Nelson and Tillman, contend on appeal that they were not found guilty beyond a reasonable doubt, arguing that the testimony of the complaining witnesses was inconsistent and that the physical evidence contradicted important portions of their testimony.

■■ The defendants first point out that all four of the victims testified that most of the offenses occurred in Nelson's apartment. The girls further stated that the apartment had a bedroom, although Louise Marino, manager of the building, testified that the apartment was a studio and had no bedroom. However, in the statement defendant Nelson made to the police, which was entered into evidence only as to her, she stated, "It was in the middle of 1982. Romanda came over to my apartment. We sat down and talked and smoked two joints. *** That same day Romanda and me *went into the bedroom.*" (Emphasis added.) We find from this evidence that a trier of fact in Nelson's case would be justified in concluding that there was some type of bedroom area used in the apartment. As to Boone and Tillman, the issue of the absence or the presence of a bedroom as such does not alter the fact that all four of the victims testified to the existence of a distinct system of juvenile prostitution, soliciting for juvenile prostitutes, taking indecent liberties with children, and pandering, embracing a number of incidents which occurred over a protracted period of time in several different locations, involving at one time or another one or more of the defendants.

■■ The defendants next point to certain inconsistencies in the girls' testimony regarding dates and their inability to describe the apartment accurately. For example, although the manager of the building testified that Nelson moved from her apartment in January 1983, all of the girls testified that they had been in the apartment on dates after that time. When the girls were asked to draw a picture of the apartment, the defendants complain, they were unable to do so. None of the girls knew the apartment number, and only one witness was certain of what floor the apartment was on. But the State argues, and we can certainly agree, as indeed the judge and jury found, that these minor discrepancies in the complaining witnesses' testimony can be explained by the extreme youth of the girls, the passage of time between the large number of different events to which they testified at the trial, and the pattern of sexual, alcohol and drug abuse

which the trier of fact found the defendants inflicted upon the girls.

According to the defendants, another area of inconsistencies in the testimony of the witnesses involved identification of the alleged offenders. Nelson, for instance, points to a variety of names used for her. She was called Denise and Nessie by the complaining witnesses. Nelson had a scar on her abdomen, which the witnesses did not remember seeing. However, as the judge stated, "With respect to the bodily scar displayed in chambers during the course of the trial, the State has correctly pointed out that it would not have been observed." Moreover, as we have previously noted, all four girls identified all of the defendants from photographs shown to them by the police and pointed them out in court.

▮ Defendants cite numerous instances in the record in which the girls gave prior inconsistent statements pertaining to the number of times they had sex with the defendants, the number of other individuals with whom the witnesses had sex, which defendants gave the girls drugs, and the length of time the girls had been involved with the defendants. As to such complaints as well as the others referred to above, this court has held:

> "However, this inconsistent statement only has the effect of impeaching the credibility of the witness against whom it is offered. [Citation.] Notwithstanding the impeaching evidence, the trier of fact may accept the credibility of the witness [against whom it is offered]." *People v. Springfield* (1975), 34 Ill. App. 3d 48, 53, 339 N.E.2d 334.

▮ If the decision of the trier of fact is to convict, and if that decision is based on credible and substantial evidence, it will not be set aside because of minor inconsistencies which the trier of fact resolved in favor of the State. (*People v. Devine* (1981), 101 Ill. App. 3d 158, 163, 427 N.E.2d 1277.) In the instant case, the complaining witnesses all testified to the same pattern of activity against the defendants. The testimony covered a period of time of over a year, and while there are some discrepancies as to dates, numbers, etc., their versions of the elemental facts are substantially the same. Furthermore, here again the differences complained of by the defendants can be explained by the youth of the girls, the period of time that transpired between the occurrences of the numerous events about which they testified and the date of the trial, and the prolonged use of alcohol and drugs by the victims.

Defendants Boone and Nelson cite *People v. Poltrock* (1974), 18 Ill. App. 3d 847, 310 N.E.2d 770, as authority for the proposition that a court of review can set aside a conviction where the evidence is so

unsatisfactory that it leaves a reasonable doubt of guilt. Boone and Nelson further rely on three appellate court cases in which convictions were reversed because the evidence was unsatisfactory. In the first case, the court reversed in part because an examination of the physical evidence showed that several of the alleged crimes had not occurred (*People v. Lindsey* (1979), 73 Ill. App. 3d 436, 392 N.E.2d 278), a circumstance not present in the case now before us.

In the second cited authority, two codefendants were tried simultaneously, one by the judge and the other by a jury. The defendant who elected the bench trial was acquitted while the other was found guilty by the jury. (*People v. Carter* (1974), 19 Ill. App. 3d 21, 311 N.E.2d 213.) In that case, the court stated, "Where codefendants are tried on the same facts, the verdicts should be consistent." (19 Ill. App. 3d at 23.) In the instant case, two defendants chose a bench trial and one chose to be tried by a jury and, as we have previously noted, all were found guilty of the same charges; thus the verdicts are obviously consistent.

■ In the third case, the evidence consisted of the testimony of a single witness, testimony which was found by the court to be "weak, contradictory, impeached and refuted." (*People v. Smith* (1971), 3 Ill. App. 3d 64, 68, 278 N.E.2d 551.) In the case at bar, the four victims presented evidence that was clearly and unmistakably consistent as to the constituent elements of the offenses with which the defendants were charged. Moreover, Nelson's statement substantiated Romanda Neeley's account of the sexual relationship that existed between them; all four complaining witnesses testified that Nelson gave them drugs; and Clark, Neeley and Zemola testified that they had sex with Nelson. As noted above, the judge found the witnesses' testimony credible and found Nelson guilty. We have been presented with no convincing reason to regard the evidence as unsatisfactory or to otherwise disturb that verdict.

Boone presented testimony regarding his incarceration during certain periods of time to which the girls testified. However, a close examination of the periods at issue reveals that Boone was in jail for two years prior to the time period involved and only three months during the year in question. Moreover, in their testimony the girls noted the occasional absences of Boone from the apartment and from the meetings of the Ladies Club. While there may have been some minor inconsistencies as to dates, we do not find this to be persuasive when viewed in light of all the evidence presented in this case.

Boone also contends that there were inconsistencies as to his identification by the witnesses, pointing out that Clark stated that she did

not know how tall he was or how much he weighed. Yet all of the girls identified Boone from photographs and in court, and they described for the jury significant differences in his appearance, notably that he now wore glasses and was thinner than he had been during the period in question. All of the witnesses testified against Boone; Zemola, Jones and Clark each testified as to having sex with him.

Boone was found guilty by a jury, which found the witnesses' testimony to be credible and returned the verdicts against him within three hours. Boone's contentions do not present us with any satisfactory reasons to set aside this verdict.

Tillman maintains that the victims did not make an immediate outcry and that Donna Clark's uncorroborated accusations against him are not enough to sustain a verdict of guilty, citing three cases to support his contention. However, each of the cases he cites involved a single occurrence of rape in which the complaining witness' testimony was found to be not only unsupported but unconvincing as well. None of the cases is similar to the instant one, in which the charges involve a series of crimes that occurred systematically over a long period of time, committed against four complaining witnesses who substantiated each others' account of the events.

■ Furthermore, it is well established in Illinois that when a conviction of a sexual offense depends upon the testimony of the victim, and the defendant denies the charge, the testimony must be clear and convincing or otherwise substantially corroborated. (*People v. Rassmussen* (1986), 143 Ill. App. 3d 11, 492 N.E.2d 612; *People v. Allison* (1983), 115 Ill. App. 3d 1038, 452 N.E.2d 148.) In the present case, Tillman's involvement with the sex ring is clearly corroborated. Clark, Neeley and Zemola all recognized him as being present in defendant Nelson's apartment and as taking an active role in the operation. The one charge with respect to which the testimony is uncorroborated is that of taking indecent liberties with a child. Donna Clark is the only one who testified that she had sex with Tillman; here, Clark's testimony does stand alone. Consequently, her testimony must be clear and convincing in order for us to uphold Tillman's conviction in regard to this particular charge.

The testimony of a complaining witness need not be crystal clear and perfect insofar as memory is concerned in order for her testimony to be clear and convincing. (*Allison*, 115 Ill. App. 3d at 1041.) In *Allison*, the testimony of a seven-year-old boy was found to be clear and convincing despite the fact that he did not immediately report the incident of sexual abuse and that he had a tendency to exaggerate.

■ Here, the trial judge found, as the trier of fact in Tillman's and Nelson's cases, "The failure of these witnesses to be precise with respect to details of time and place under the circumstances was far more natural than unnatural." Further, the record discloses that on cross-examination Donna Clark did not contradict the testimony she gave on direct examination despite a long and grueling interrogation. Her testimony is clear and convincing and by no means creates a reasonable doubt as to defendant Tillman's guilt.

Defendants Boone and Nelson also claim that they were denied a fair trial because the trial judge interrupted the witnesses and asked questions of his own. The State maintains that the judge's questioning was for the purpose of clarification and within the bounds of the court's discretion. This court has previously stated:

"It is clear that a trial judge has the right to question witnesses in order to elicit the truth or to bring enlightenment on material issues which seem obscure, [citations], or to clarify ambiguities in the witness' testimony. [Citations.] The propriety of such examination must be determined by the circumstances of each case and rests largely in the discretion of the trial court." People v. Delk (1981), 96 Ill. App. 3d 891, 900-01, 421 N.E.2d 1341.

■ Defendants cite over two dozen instances in the record in which the judge initiated questioning of the witnesses or interrupted testimony to ask questions, but our examination of these examples fails to demonstrate that any of them constitutes an abuse of discretion on the part of the court. The court's questioning was often in response to a witness' confusion about a question; on other occasions the judge's questions were designed to obtain further information from a witness or to clarify an answer.

The cases cited by defendants in an attempt to demonstrate judicial abuse on the part of the trial court illustrate only extreme situations. In one case, for example, a judge openly accused a witness of lying and withholding evidence. The same judge also said that a certain comment of a witness was "typical of these people." (People v. Tyner (1964), 30 Ill. 2d 101, 105, 195 N.E.2d 675.) In another case, People v. Cofield (1973), 9 Ill. App. 3d 1048, 293 N.E.2d 692, the appellate court found that the trial judge had not merely attempted to clarify issues but had assumed the role of prosecutor; for example, he called the State's witnesses, conducted the examinations and asked questions directed at eliciting testimony against the defendant. (9 Ill. App. 3d at 1051.) In a third case, the trial judge interrupted defense counsel's closing argument and stated, "Who said so? *** I didn't

hear that." (*People v. Bowie* (1976), 36 Ill. App. 3d 177, 180, 343 N.E.2d 713.) In *Bowie*, the record further showed that the judge did not remember what the crux of the defense was when he entered judgment. None of the foregoing circumstances is present here.

■ Additional comments made by the trial judge in the instant case involved his admonishing defense counsel regarding the length of cross-examination and the propriety of impeachment. These comments, however, were made outside the presence of the jury and do not in any way suggest that counsel was impeded in conducting his defense. We find defendants' charges of judicial abuse in this case and the authorities they cite in support thereof to be irrefragably disparate.

Nelson and Boone further contend that they should have been granted a mistrial because of certain other testimony given by Officer Vana. Prior to trial, the court granted Boone's motion to preclude the State from introducing the nature of his previous offenses.

Officer Vana testified that as a youth officer assigned to investigate allegations of sexual exploitation of residents of the Mary Bartelme Homes, he talked to some of the juveniles. Vana testified as follows:

"Q. [Assistant State's Attorney] What names were given to you?

A. [Vana] Al, Hollywood and Nessie.

Q. With reference to the names of Al and Hollywood that was given to you, did you do any investigation with regard to those two names?

A. Yes.

Q. What was your investigation that you did?

A. We did an investigation as to the identity of Al and Hollywood.

Q. What did your investigation as to their identity consist of?

A. We interviewed other officers in our unit that had done sexual exploitation cases in the Rogers Park area—"

An objection by defense counsel was immediately sustained. A motion for mistrial was made and denied.

Defendants contend that Vana's statement about talking to other officers who had worked on sexual exploitation cases amounted to trial by insinuation. They point out that neither Boone nor Nelson had any prior provable criminal history relating to sex offenses. Additionally, defendants maintain that they could not rebut these inferences without giving up their right not to testify.

■■ A mistrial should be granted only when the original trial is so sufficiently flawed or defective that a conviction would probably be reversed on appeal. If the problem could have been adequately corrected without aborting the trial, and a guilty verdict would be reasonably supportable on appeal, "neither manifest necessity [n]or the ends of public justice require a mistrial." (*People v. Phillips* (1975), 29 Ill. App. 3d 529, 534, 331 N.E.2d 163.) As previously noted the judge in the instant case immediately sustained defendants' objection to the statement.

■■ Even if this court were to assume, *arguendo*, that the defendants' contention had merit, the remarks of Officer Vana would not warrant a new trial in view of the fact that the evidence of defendants' guilt was incontestably substantial. Both the judge and the jury found the defendants guilty. We fail to perceive that the verdict would have been different if the remark had not been made.

■■ Boone's next contention is that he was denied a fair trial because of remarks made by the State in its rebuttal to defendant's closing argument. However, he failed to object to any of the complained of statements at the time they were made, nor did he raise the issue in his post-trial motion. It is hornbrook law that failure to object to allegedly improper comments waives the issue for review. (*People v. Edwards* (1973), 55 Ill. 2d 25, 35, 302 N.E.2d 306, *cert. denied* (1974), 415 U.S. 928, 39 L. Ed. 2d 486, 94 S. Ct. 1437; *People v. Washington* (1984), 127 Ill. App. 3d 365, 384, 468 N.E.2d 1285.) Moreover, if the defendant's attorney fails to object to the argument deemed to be improper, a court of review will not reverse a conviction unless it appears that the defendant was deprived of his right to a fair trial. *People v. Romero* (1967), 36 Ill. 2d 315, 320, 223 N.E.2d 121; *People v. Young* (1975), 33 Ill. App. 3d 443, 447-448, 337 N.E.2d 40.

Assuming *arguendo* that there has been no waiver, Boone points to four statements in the State's rebuttal to his counsel's closing argument which he claims are prejudicial and inflammatory. During the course of that argument, the prosecutor made the following comments:

> "It really boils down to you people here. People talk about the community, crime is running rampant. Ladies and gentlemen, in this court room here you have an opportunity to say, hey, the buck stops here. We're not going to let this go on in our community.
>
> Think about the next thirteen year-old that is walking out there on the street. Think about her. Don't let this man go back

out that door. Don't let him walk back into the community to ruin the life of another thirteen year-old girl."

■■■ Defendant contends that these statements were improper because they were intended to arouse fear in the jurors' minds, citing *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827, in support of the proposition that a prosecutor may dwell on the evil of crime, but should refrain from making inflammatory appeals to the fears of the jury. While it is true that in the *Crossno* case the court found the statement, "Tomorrow, it may be your son or my son" to have an inflammatory effect, it nevertheless held that the remark did not rise to the level of reversible error. (93 Ill. App. 3d at 824.) Furthermore, warnings to the jury that they should not release the defendant unless they wanted an unsafe community have been found not to be inflammatory in nature. *People v. Tedder* (1980), 83 Ill. App. 3d 874, 884, 404 N.E.2d 437.

■■■ Boone also objected to the State's comment that a witness had not been called by the defense. The assistant State's Attorney's comment was as follows:

"Where is Assistant State's Attorney Stavropoulus? *** This man has subpoena powers like we have subpoena powers. *** So you know that if you would have heard it any differently from State's Attorney Stavropoulus, that something shady went on, they would have had Stavropoulus on that stand testifying."

However, the remark was in response to a statement made by the defense attorney in his closing argument:

"And Officer Vana said there was an Assistant State's Attorney at the photo session with Donna Clark named Stavropoulus, something to that effect, why didn't he appear here? Couldn't he had [*sic*] given some reliability to the fair identification procedure that took place there with Donna Clark?"

The rule is well established that "[a] defendant may not complain of statements made in rebuttal closing argument by the prosecutor which were invited by remarks made by defense counsel." *People v. Barnes* (1983), 117 Ill. App. 3d 965, 976, 453 N.E.2d 1371.

Boone further contends that the prosecutor's rebuttal argument contained two false statements; however, we do not find these charges to be substantiated by the record. He also raises an additional point regarding a civil suit filed by Donna Clark, one of the complaining witnesses, against the director of Jarvis House, the Illinois Department of Children and Family Services and others. Boone contends that the prosecutor argued that the suit was for the benefit of way-

ward girls when it was actually a suit brought for money damages.

■■■ *Arguendo*, even if we found this to be the case, such remarks would not warrant reversal unless they were such a material factor in the defendant's conviction that the jury would likely have reached a contrary verdict had they not been made. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929.) We cannot perceive how the comments complained of here could have affected the outcome of this case. More important, as we have noted above, a defendant is estopped from asserting such prejudice where the comments of which he complains were provoked or invited by the arguments of his counsel. (*Clay*, 124 Ill. App. 3d at 149.) It was defense counsel in this case who raised the matter of the civil suit in his closing argument; the prosecutor was merely responding to that remark. We do not find Boone's contention that the State's closing argument deprived him of a fair trial to be persuasive.

Boone further contends that the trial court erred in considering certain information offered in aggravation at his sentencing hearing. After he had been arrested, given his *Miranda* warnings, and assigned an attorney, Boone made a statement to Officer Vana as to which Vana testified as follows:

"Q. [Assistant State's Attorney] After having advised him of his rights for the second time, did Defendant Boone say anything to you?

A. [Vana] Yes, he did.

Q. What did he say?

A. He began in the processing. I was asking him questions pertaining to the arrest report and I asked him if he had any nicknames and he said no. I asked him if his name was Hollywood and he said no. He just went on saying he did not know Al Tillman or Alice Nelson.

Q. What else did he say?

A. He said he is going to take care of anyone who testifies against them in this case.

Q. Did you ask him what he meant by that?

A. I said do you mean you would kill the witnesses or the victims or what are you talking about? He said, yes, I will. I am not afraid of going back to the penitentiary, and I am not afraid of dying. He kept on talking.

Q. What did he say?

A. He said that he currently had a juvenile pimping case pending in which the arresting officer was a Youth Officer Joyce from our unit and when he gets out—

Q. Do you know Officer Joyce?

A. Yes, I do.

Q. He is in your unit.

A. As soon as he gets out of penitentiary [*sic*], he is the first one he is going to take care of, and he is going to kill him.

Q. Who is that?

A. Officer Joyce.

Q. The Defendant Boone say anything else?

A. He told me if I was smart I would forget about the conversation we just had."

Boone contends that this statement, although not introduced at trial, was taken in violation of his fifth and sixth amendment rights and was incorrectly admitted at the sentencing hearing. The State characterizes the statement as voluntary.

The Illinois Supreme Court reiterated in *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344, the guidelines for the type of information that may be elicited at a sentencing hearing by quoting from *People v. Adkins* (1968), 41 Ill. 2d 297, 242 N.E.2d 258, as follows:

"In Illinois, too, we have long held that the judge in determining the character and extent of punishment is not limited to considering only information which would be admissible under the adversary circumstances of a trial. While it must exercise care to insure the accuracy of information considered and to shield itself from what might be the prejudicial effect of improper materials [citation], 'the court is not confined to the evidence showing guilt, for that issue has been settled by the plea. The rules of evidence which ordinarily obtain in a trial where guilt is denied do not bind the court in its inquiry. It may look to the facts of the [crime], and it may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense. In doing so it may inquire into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and, as was said in *People v. Popescue*, [345 Ill. 142], the judge should know something of the life, family, occupation and record of the person about to be sentenced.' " 41 Ill. 2d at 300-01.

In addition, the *La Pointe* court quoted the United States Supreme Court's "fundamental sentencing principle" as articulated in *United States v. Tucker* (1972), 404 U.S. 443, 30 L. Ed. 2d 592, 92 S.

Ct. 589; "[A] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." 404 U.S. at 446, 30 L. Ed. 2d at 596, 92 S. Ct. at 591.

The trial judge in the instant case stated:

> "The court has considered the presentence report in this case, the arguments of counsel, the statements of defendants, the evidence heard during the trial of the case, the prior history of criminal delinquency, or lack thereof, of each defendant and the rehabilitative potential of each defendant."

■■ Although the trial court never specifically determined whether the statement testified to by Vana was taken in violation of Boone's constitutional rights, we do not find that determination to be necessary for we find no evidence in the record that the trial judge relied on Officer Vana's testimony in determining Boone's sentence. "Absent any indication that incompetent evidence was actually considered in sentencing defendant, it must be presumed that the court disregarded it unless the record discloses evidence to the contrary." *People v. Strait* (1983), 116 Ill. App. 3d 110, 114, 451 N.E.2d 631.

Further, neither our Constitution, nor our case law, nor our statutes requires a judge to detail for the record the thought process by which he concludes that the penalty he imposes is appropriate. (*People v. La Pointe*, (1981), 88 Ill. 2d 483, 431 N.E.2d 344; *People v. Ruskey* (1986), 149 Ill. App. 3d 482, 501 N.E.2d 146.) Besides, given Boone's previous convictions for theft, armed robbery, battery, unlawful use of weapons, and bribery, a 14-year sentence would seem to be amply justified without the court's having considered any aggravating factors.

In sum, we find no basis in the record or in any of these cases upon which any of the defendants' assignments of error on the part of the trial court can be sustained.

Affirmed.

HARTMAN, P.J., and BILANDIC, J., concur.