THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BARRY L. FLAX, Defendant-Appellant.

First District (1st Division)   No. 85—0701

Opinion filed September 22, 1986.

Steven Clark and Joan S. Colen, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Thomas P. Needham, and Sharon L. Gaull, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINLAN delivered the opinion of the court:

The defendant, Barry Flax, was charged by a multicount indictment with the offenses of attempted murder, armed violence and aggravated battery. The defendant claimed at trial that he shot the victims, Roy Reynolds, and Chicago police officers Thomas Bolling and John Ryan in self-defense. The jury found the defendant guilty of attempted murder, armed violence and aggravated battery with respect to the Reynolds and Bolling shootings but acquitted him on all charges relating to the Ryan shooting. The court denied the defendant's motion for a new trial and sentenced the defendant to concurrent terms of 15 years' imprisonment on the two attempted murder counts. This appeal followed.

On appeal, the defendant asserts: (1) he was improperly precluded from introducing state-of-mind evidence which was vital to his defense; (2) he was improperly precluded from testifying that he had no prior criminal record; (3) the prosecutor's humiliating and harassing cross-examination of defendant deprived him of a fair trial; (4) the State failed to preserve material evidence which deprived him of a fair trial; and (5) the court abused its discretion by imposing an excessive sentence.

At approximately 11:30 p.m. on May 2, 1984, Barry Flax entered a tavern, Zip's Place, located on the west side of Chicago. Flax, who testified he was a holder of a black belt in the martial art of jujitsu, had in his possession a spring-loaded metal bar referred to as a "Japanese Baton." Flax also testified that he carried the baton for protection because he had once been robbed. He said that he had

brought the baton into Zip's Place on four prior occasions, and each time, he checked the baton with the bartender. On this evening, Flax saw no bartender so he approached the owner, Rozette Adams (Zip), and offered Zip the baton to hold. According to Flax, Zip slapped the baton out of his hand and told him that he would not hold anything like that and to get his "mother fucking black ass out of the tavern." Flax picked up the baton, began to walk out of the tavern, and said, "I'll be back." Flax testified that he then heard what sounded like a gunshot as he headed towards the door. He said he did not see who fired the shot or from what direction it came. No one else who was in the bar at the time and who later testified at the trial heard a gunshot. After hearing what he thought was a gunshot, Flax said he ran to his car and drove home.

Witnesses for the State, however, testified that Zip followed Flax out of the tavern and the two began to talk. Allegedly, the two were later joined by Zip's brother and Thomas Bolling who was an off-duty Chicago police officer. Bolling testified that, when Bolling and Zip's brother appeared outside, Flax said, "This is our conversation." Flax then left, and Zip, Zip's brother and Bolling went back inside the tavern.

Flax testified that he drove home, changed into an outfit worn during his jujitsu exercises, and obtained his 12-gauge shotgun which, at that time, he believed contained seven live shells. He placed another 10 live shells in his pocket, and he proceeded to walk back to the tavern.

Flax arrived at the tavern approximately five to eight minutes after he left the first time and, according to the testimony introduced by the State, there were about 20 people in the bar at that time. However, Flax testified that he only saw Bolling, Reynolds and the barmaid, Gertrude Nelson, upon reentering.

As Flax entered the tavern carrying his shotgun, Nelson shouted, "Look at this fool coming through here with this gun." Nelson testified that she then hid behind a chair while everyone else dropped to the floor. Nelson said that Flax moved the chair and pointed the shotgun directly between her eyes. He held the gun about one inch from the bridge of her nose and told her to move. Flax asked, "Where is that fat ass Zip," and then said, "Zip, I am for real. I don't play."

Meanwhile, Zip hid behind the ice machine located near the bar, and Bolling was crouched behind the bar and was holding his handgun, a .38-special automatic. Bolling testified that he heard a shot. At this point, Bolling said he stood up, took aim at the defendant

and pulled the trigger. His gun misfired because there was no bullet in the chamber. Bolling ducked back behind the bar. Flax fired his shotgun towards Bolling which Flax claimed was intended as a warning shot in response to Bolling's attempt to shoot at him.

Bolling then placed a bullet in the chamber, jumped up, fired four or five rounds in rapid succession. Somehow he missed the defendant, and again ducked behind the bar. Flax walked over to the bar, stood on the footrail and shot Bolling as he was lying on the floor. The spray of pellets from the blast struck Bolling in his lower left back and hip. Flax then left the bar.

After Flax left the tavern, Zip got his handgun, a Smith & Wesson nine-millimeter automatic, and kept the weapon with him in case the defendant returned. One of the patrons in the tavern, Roy Reynolds, picked up Bolling's gun and left the tavern pursuing Flax. Reynolds spotted Flax in an alley putting the shotgun into a case and confronted him. Flax told Reynolds to go about his business; the matter did not concern him. The two began to argue and the argument soon escalated into a gunfight. It is disputed as to who shot first and how many shots were fired, but Reynolds fired his weapon at least once, and Flax' first shot struck Reynolds in the face. Flax' second shot struck Reynolds in the back. At this point, Reynolds proceeded to break off the encounter and ran south on St. Louis Street. He reversed direction and began to run north when Flax subsequently blocked his escape by that route. Flax then fired his third shot as Reynolds was running away. This shot struck Reynolds in the lower right arm near the elbow. Reynolds, thereafter, fell to the ground when struck by the fourth shot fired by Flax. The other police officers who had now appeared on the scene subdued Flax before he could fire again. Reynolds sustained wounds to the right side of his face, neck, back, abdomen, both thighs, right buttock, right elbow and forearm. He remained hospitalized for one month and was required to undergo three operations on his elbow and forearm.

John Ryan was one of the policeman dispatched to the scene. Ryan suffered eleven pellet wounds from the blasts which Flax had fired, and, although intended for Reynolds during their encounter, had struck Ryan as Ryan was pursuing Flax.

The police subsequently recovered the shotgun and 10 live shotgun shells from the street where they had subdued Flax. Additionally, the police also recovered three expended shotgun shells, as well as the gun used by Reynolds and Bolling.

From inside the tavern, the police also recovered one live and

two expended shotgun shells. In addition, they recovered two pieces of shotgun wadding, and, from behind the bar, the police recovered five expended .38-caliber cartridges. Copper jackets and lead particles from bullets were discovered inside a fuse box on the wall. After the tavern patrons were transported to the police station for interviews, the police discovered another copper jacket from a bullet on the floor near the door.

Zip's gun was checked at the scene by one of the policemen to determine if it had been fired. The policeman smelled the gun and checked the number of bullets. Later, the gun was returned to Zip following a check of the identification and registration of the gun. However, there was no mention of Zip's gun in any of the police reports.

The defendant in this appeal initially contends that he was improperly prevented from presenting evidence that he claims was vital to his theory of the case. He argues that the reason he returned to the tavern after the initial altercation with Zip was crucial to his claims that he acted in self-defense and that he lacked any intent to kill. The defendant's contention is the result of the following limitation by the trial court of his counsel's interrogation during his direct examination:

"Q. [Defense Attorney] Why did you return home to get your gun?

A. [Defendant] Because I figured I don't have a chance.

[Assistant State's Attorney]: Objection to what he figured.

THE COURT: The objection will be sustained.

Q. What was it that caused you to return home to get your gun?

A. Because there has been numerous occasions-

[Assistant State's Attorney]: Objection.

THE COURT: The objection will be sustained."

The defendant asserts that his state of mind when he went to get his shotgun and his reason for returning to the tavern were of central importance to his claim of self-defense, and, therefore, he should have been permitted to testify concerning this. The State, on the other hand, first, claims that the defendant waived this claim by failing to raise the issue in his post-trial motion with any specificity, and, by failing to make any offer of proof as to what his evidence would disclose. Secondly, the State argues that the defendant was, in fact, permitted to testify as to his state of mind when it was relevant to the issues before the trial court, i.e., immediately prior to the shootings. Thus, the State says the defendant was not preju-

diced by the court's action in sustaining the State's objections and, contrary to the defendant's contentions, no reversible error occurred.

The record discloses that the defendant was permitted adequate opportunity to testify about his state of mind immediately prior to shooting Bolling and Reynolds. The defendant testified that he was still somewhat afraid of being killed when he entered the tavern with the shotgun. Flax claimed that this was the reason for his return with the weapon. The defendant was also permitted to testify as to his state of mind when he shot Bolling. He testified that he noticed that his heart started beating faster when he heard Bolling's gun misfire. He said he shot Bolling because Bolling "was planning on doing the same thing to [him]," and, therefore, he shot Bolling as a response to what he thought was a threat to his life but did not intend to kill Bolling. Furthermore, Flax testified that his heart started beating faster when he spotted Reynolds approaching him in the alley holding a gun. He testified that he shot at Reynolds to disarm him, and, did not intend to kill Reynolds either.

However, the defendant contends that he should have been permitted to testify as to his state of mind at times other than just immediately prior to the shootings and cites *People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293, in support of this contention. We find *Graves* to be distinguishable from the case before us.

In *Graves*, the defendant became involved in an argument inside a tavern concerning a pool table and, thereafter, intentionally pushed the balls on the pool table into the pockets preventing the victim from playing a game. According to the defendant's testimony, the victim called him a name, knocked him to the floor, and threatened to cut his head off if he did not get the key to release the balls from the pool table. The defendant went into a back room where the key was kept, but could not find the key, and, instead, found a pistol. He did not leave the tavern by the back door which was unlocked because the back exit was guarded by a doberman pinscher. The defendant returned to the front of the tavern in about three minutes with the pistol he had found. Another altercation developed and the victim attempted to strike the defendant with a cue stick, and the defendant shot the victim twice.

The defendant in *Graves* had wanted to testify that he was frightened of the victim, that he became more frightened when he could not find the key to the pool table, and that this was the reason he took the pistol from the back room when he returned to the front of the tavern. He also wanted to testify as to his state of

mind when the victim allegedly came at him with a pool cue, and when the victim reached into his pocket. There, it was held to be prejudicial error for the trial court to preclude such testimony under the circumstances. The proffered testimony, the court said, if believed by the jury, would have explained why the defendant returned to the front of the tavern with the pistol and why he fired more than one shot.

■■ However, that was not the situation in this case. While in both *Graves* and this case short time periods separated the two altercations, *i.e.*, five to eight minutes here and three minutes in *Graves*, in *Graves* the confrontation continued throughout, but here the defendant had initially abandoned the fight, only later returning with his shotgun, and, reinitiating the confrontation. Since the defendant in *Graves* was continually engaged in the confrontation which ended with the shooting, his state of mind at that time was relevant to his claim of self-defense, and the trial court committed prejudicial error when it prevented the defendant from testifying about his state of mind during the occurrence. Here, however, unlike the situation in *Graves*, Flax withdrew from the encounter with Zip, left the tavern and returned home. At that point, Flax had retreated from the fight and reached a place of safety. Accordingly, his state of mind was not relevant to the issue of whether he later shot the victims in self-defense when he reinitiated the fight because he was not, and could not have been, at that time, in fear for his life.

The defendant also contends that he was improperly precluded from introducing evidence that he had no prior criminal record. Before trial, the court granted the State's motion *in limine* to preclude the defense from bringing into evidence the fact that the defendant had no prior criminal history. The defendant argues that it was error to grant this motion because the fact that he had never been arrested or convicted is relevant to the issue of whether he acted in self-defense and, additionally, makes his testimony more credible.

■■ The defendant in a criminal case may introduce evidence of his good character in order to establish that his character traits are inconsistent with the commission of the crime charged (*People v. Lewis* (1962), 25 Ill. 2d 442, 185 N.E.2d 254; *City of Chicago v. Lowy* (1976), 40 Ill. App. 3d 950, 353 N.E.2d 208), but this is accomplished by introducing evidence of his general reputation for the specific character trait (*People v. Lewis* (1962), 25 Ill. 2d 442, 185 N.E.2d 254). A defendant, however, is not permitted to introduce evidence of specific acts or personal opinion (*Voga v. Nelson* (1983),

115 Ill. App. 3d 679, 450 N.E.2d 1364), and, accordingly, a criminal defendant cannot prove his good character by showing that he "had never been previously arrested, charged, prosecuted, or convicted of a crime. (1 Wharton's Criminal Evidence sec. 230, at 499 (13th ed. 1972); see 22A C.J.S. *Criminal Law* sec. 678 (1961).)" *City of Chicago v. Lowy* (1976), 40 Ill. App. 3d. 950, 954, 353 N.E.2d 208.

■ Nevertheless, the defendant argues that an exception to this rule is appropriate, asserting, *inter alia*, that such evidence is "undeniably relevant," and would have assisted the jury in determining whether he was guilty of the crimes charged. The defendant's claim of relevance is based upon the fact that a victim's convictions for violent crimes are admissible to show that the victim was the aggressor when the defense of self-defense is raised. (See *People v. Lynch* (1984), 104 Ill. 2d 194, 407 N.E.2d 1018; *People v. Hanson* (1985), 138 Ill. App. 3d 530, 485 N.E.2d 1144.) Therefore the defendant argues that his lack of convictions for violent crimes should be admissible to prove that he was not the aggressor. We do not find this argument persuasive. Just as the defendant's criminal record in a criminal trial is generally irrelevant, so, too, is the defendant's lack of a criminal record irrelevant to the issue of whether he committed the offense charged. Accordingly, such testimony by the defendant that he had no prior criminal record would have been improper, and the trial court was correct in granting the State's motion.

■ The defendant next contends that the misconduct of the prosecutor while cross-examining the defendant deprived him of a fair trial. He claims that the prosecutor persisted in asking the same type of harassing and argumentative questions after defense objections were sustained, and thereby forced his attorney to continually object. The defendant argues that the prosecutor's conduct placed his attorney in the role of an obstructionist, and also had the effect of eliminating any benefit from the trial court's rulings sustaining the objections.

Our examination of the record reveals that the defendant's claims relate to approximately 10 questions asked by the prosecutor during the defendant's cross-examination. In most instances, after the trial judge sustained defense counsel's objection, apparently directed to the form of the question, the prosecutor either rephrased his question or moved on to another subject.

The defendant cites *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432, and *People v. Weinger* (1981), 101 Ill. App. 3d 857, 428 N.E.2d 924, in support of his claim that prejudicial error occurred in his case as a result of the prosecutor's action. However,

we find those cases are distinguishable from the present case. In *Weinstein,* the prosecutor there made numerous statements in front of the jury that criminal defendants were affirmatively required to present evidence creating a reasonable doubt before they could be found not guilty. The supreme court found this to be prejudicial error and ordered a new trial. There, the prosecutor's comments destroyed the defendant's presumption of innocence, and the court said they were "tantamount to telling the jury that the defendant had the burden of proving [his] innocence." *People v. Weinstein* (1966), 35 Ill. 2d 467, 470, 220 N.E.2d 432.

In *People v. Weinger* (1981), 101 Ill. App. 3d 857, 428 N.E.2d 924, the prosecutor, on more than 20 occasions, repeatedly asked questions to which the trial judge had already sustained defense objections. The conduct there did result in casting defense counsel in the role of an obstructionist, and the court condemned the conduct as reprehensible. 101 Ill. App. 3d 857, 871, 428 N.E.2d 924.

However, the prosecutor's conduct here did not rise to such an egregious level as displayed in *Weinstein* and *Weinger.* The prosecutor did not continually misstate a fundamental rule of law, *e.g.,* that a defendant is presumed innocent until proved guilty, nor did the prosecutor continually ask the same question after repeated defense objections were sustained. As stated previously, the prosecutor discontinued the line of questioning when the defense counsel's objections were sustained or he reformed his question. We believe that the State's cross-examination here was merely a zealous attempt to highlight the defendant's improbable claim of self-defense. Accordingly, we do not find that the improper questions asked during the defendant's cross-examination constituted a material factor in his conviction and that any error that did occur was harmless in light of the record before us. See *People v. Chupich* (1973), 53 Ill. 2d 572, 295 N.E.2d 1; *People v. Velillari* (1980), 84 Ill. App. 3d 333, 405 N.E.2d 466.

■ The defendant next contends that he was deprived of a fair trial in violation of the principles set forth in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. The defendant claims that the prosecutor, during rebuttal argument, actually took advantage of the State's failure to preserve material evidence, *i.e.,* Zip's gun. The defendant asserts this occurred when the prosecutor argued that there was no evidence to show that Zip's gun had even been fired during the initial altercation. He claims it was the State's duty to preserve Zip's gun for testing to determine whether, in fact, it had been fired, and the State failed to do so. He submits

that the State's failure to preserve the gun for testing constituted a denial of his constitutional right to due process.

The State, on the other hand, asserts that it was proper for the police to return the gun to Zip and, furthermore, that the prosecutor's comment was proper and based upon the evidence in the record. Additionally, the State argues that Zip's gun was neither relevant nor material because the defendant became the aggressor when he armed himself with a shotgun and returned to the scene of an earlier altercation.

The Supreme Court in *Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97, held that a violation of due process occurs when the prosecution suppresses evidence specifically requested by the defense which is favorable to the defendant and is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish such a violation, the defendant must show the following: (1) the evidence was favorable to him; (2) the prosecutor failed to disclose the evidence after a specific request; and (3) that the evidence was material. *People v. Velez* (1984), 123 Ill. App. 3d 210, 462 N.E.2d 746.

■ Here, the record discloses that the defendant made no request for a listing of any weapons discovered in the area of the shootings on or shortly after the night in question. The defendant did, however, make a general request for "[a]ny and all material or information within [the State's] possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor." When, as here, the evidence allegedly claimed to be withheld is in violation of a general request, a new trial is not justified if there is no reasonable doubt about guilt whether or not the additional evidence is considered. *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392; *People v. Velez* (1984), 123 Ill. App. 3d 210, 462 N.E.2d 746.

Our examination of the record leads us to conclude that the omitted evidence would not create a reasonable doubt concerning whether the defendant shot the victims in self-defense. The right to defend oneself does not permit one to pursue and shoot an aggressor where the quarrel had been abandoned. (*People v. Love* (1980), 83 Ill. App. 3d 948, 404 N.E.2d 1085; *People v. Shappert* (1975), 34 Ill. App. 3d 683, 340 N.E.2d 282.) A defendant may be justified in the use of force during the course of a fight, but such justification vanishes when the defendant is able to make his escape. (*People v. Munguia* (1975), 33 Ill. App. 3d 880, 338 N.E.2d 574.) Accordingly,

whether or not Zip's gun was in fact fired is neither relevant nor material to the issue of whether the defendant acted in self-defense when he shot Bolling upon his return to the tavern with the shotgun, or when he subsequently shot Reynolds.

The record further discloses that the physical evidence recovered from inside the tavern indicated that the defendant's shotgun and Bolling's weapon were discharged, but none of the evidence indicated that Zip's gun had been fired. Even if the State had preserved Zip's gun for testing, the firearms expert for the State testified that no test existed to determine when a gun had last been fired. Thus, if the weapon had been preserved, it could not have been shown that Zip had fired the gun during the confrontation. However, as stated, this was not, in any event, relevant or material to the defendant's claim of self-defense. Accordingly, under the circumstances here, we find no error in the prosecutor's comment.

Finally, the defendant contends that the trial court abused its discretion by imposing concurrent 15-year sentences. The determination and imposition of a sentence is a matter that involves considerable judicial discretion. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) Accordingly, a court of review should not interfere with the trial court's decision absent an abuse of discretion. (*People v. Trimble* (1985), 131 Ill. App. 3d 474, 475 N.E.2d 971.) Here, the trial judge considered the fact that the defendant had no prior criminal record and that he had a good military service record. However, the judge also considered the serious injuries sustained by the victims. While the judge did not think an extended term was appropriate, he did consider the minimum sentence required under law, *i.e.*, six years' imprisonment, inappropriate. Based on the record presented here, we cannot say that the court abused its discretion by imposing concurrent sentences of 15 years' imprisonment under the circumstances.

Accordingly, for the reasons set forth above, the judgment and sentence of the circuit court of Cook County is affirmed.

Judgment affirmed.

BUCKLEY and O'CONNOR, JJ., concur.