THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES A. WHEELER, Defendant-Appellant.

Third District   No. 3—90—0184

Opinion filed July 19, 1991.—Rehearing denied August 27, 1991.

STOUDER, P.J., dissenting.

Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.

Marc Bernabei, State's Attorney, of Princeton (Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SLATER delivered the opinion of the court:

The defendant, Charles A. Wheeler, was convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1)) and sentenced to 20 years in prison. The defendant raises the following issues on appeal: (1) whether he was proved guilty beyond a reasonable doubt; (2) whether the defendant was denied a fair trial because he was precluded from having an expert witness examine or interview the complainant; (3) whether the defendant was denied a fair trial by the exclusion of certain expert testimony; (4) whether the jury was improperly instructed; and (5) whether improper comments and arguments by the prosecution denied the defendant a fair trial. We affirm.

Cheryl K., the complainant's mother, testified that she married the defendant in November of 1977 and that they had a child in February of 1978. Cheryl and the defendant separated when com-

plainant was nine months old and they were subsequently divorced. Complainant had no further contact with the defendant until February of 1987. This visit came about because complainant wanted to see her real father. Defendant lived in Princeton, Illinois, while complainant and her mother lived in Davenport, Iowa. After this first visit, complainant wanted to see the defendant again. Arrangements were thus made for complainant and her father to spend two or three weekends together. During that period of time, complainant talked very highly of her father and seemed to be happy that he was a part of her life, according to Cheryl. Complainant also spent the summer of 1987 with defendant.

Cheryl testified that complainant went away to camp during the summer of 1988. In August of 1988, Cheryl, complainant, and the rest of the family moved to Decatur. They returned to Davenport a month or so later. In December of 1988, complainant said that she wanted to see the defendant again. Complainant visited the defendant on two or three weekends in January of 1989. The defendant would pick up the complainant on Friday night or Saturday morning and bring her back home on Sunday evening. Although Cheryl and the complainant were fairly sure that one of the weekends was January 14 and 15 because of Martin Luther King's birthday, they were uncertain about the dates of the other weekends. Cheryl agreed that prior to January, complainant had remarked on several occasions that she wanted to live with her father.

Cheryl further testified that complainant might have spent her last weekend alone with defendant in February of 1989. Complainant visited the defendant again, as late as Easter of 1989, but not alone. On July 14, 1989, Cheryl suggested that complainant spend part of the summer with her father. Complainant started crying and said that defendant had sexually abused her.

The complainant, who was 11 years old at the time of trial, testified that she first saw the defendant in February of 1987, when she was nine years old. She visited defendant two or three times in January of 1989. She thought the last time that she was alone with the defendant might have been the weekend of Martin Luther King's birthday. Complainant testified that during this last visit, the defendant asked her to sleep in his room. She got into his bed wearing a nightgown and underwear. The defendant got into bed naked. He kissed complainant on the cheek and put his tongue in her mouth. Complainant stated that the defendant told her that what they were doing was practice for when she grew up. Defendant then rubbed her vagina with his hand and took off her under-

wear. While holding her legs apart he kissed her vagina. Complainant said that her legs began to shake and the defendant told her that that happened to all women. The defendant then rolled over on his back and had the complainant get on top of him. After the complainant refused to put the defendant's penis in her mouth, he told her to squeeze his penis, which she described as hairy and stiff, and "sticky stuff" came out. The complainant testified that while this was occurring, the defendant was licking her vagina and was panting "[l]ike a dog does after it gets done running." The complainant also stated that the defendant told her that she felt like her mother. At one point the defendant asked her if she would like him to stop, but when she said yes, he said he could not. The complainant said that the defendant told her not to tell anyone or he would go to prison forever. She testified that she did not tell anyone right away because she was scared.

The complainant further testified that she and the defendant had engaged in similar conduct on "about two" other weekends in January of 1989 and "more than 10" times prior to that. Complainant stated that she thought that defendant first sexually abused her two or three weeks after they met. At that time, the defendant was living with Cathy Cannon. The complainant agreed that she may have told the police that the sexual contact began in June of 1987 after the defendant and Cannon broke up, and that she slept in defendant's bed most of that summer. The complainant stated that it was her idea to reinitiate contact with the defendant in January of 1989. When asked why she would do so if she had been abused in the past, she replied that she thought the defendant would change.

Elsie (Pat) Elmore testified that she conducts child abuse and neglect investigations for the Iowa Department of Human Services. On July 14, 1989, she went to the complainant's residence in response to a call and interviewed the complainant and her mother. The facts related by the complainant to Elmore were consistent with the complainant's testimony related above, including the defendant's alleged statements that he couldn't stop and that he would go to prison if the complainant told anyone. The complainant also told Elmore that before the defendant would leave he would breathe as though he had been running hard and was out of breath. According to Elmore, the complainant told her that the defendant began sexually abusing her the first time she visited him.

Pamela Klein, a psychotherapist involved in psychological counseling and consultation, testified that she interviewed the complain-

ant. Based on her interview, she determined that the complainant exhibited symptoms consistent with rape trauma syndrome. On cross-examination, Klein testified that her findings were based solely on her interview with complainant; she did not examine the complainant's school records or medical records.

The final prosecution witness was Gary Swanson, an investigator with the Princeton police department. Swanson testified that he interviewed the complainant and her mother on July 19, 1989. The complainant told Swanson that she spent the summer of 1988 at defendant's house in Princeton and that, during that summer, she slept most nights in his bed. The complainant's description of sexual abuse was consistent with her testimony at trial. In addition, the complainant demonstrated what had happened with anatomically correct dolls. She told Swanson that the last incidents occurred on three weekends in January and she thought the dates were December 31 of 1988 and January 14 and 28 of 1989.

Swanson also testified also concerning a second interview conducted on August 3, 1989. The complainant described essentially the same sexual activities during the second interview that she had during the first, although she stated that she spent the summer of 1987 at her father's home, not the summer of 1988. She also said that the last incidents occurred on the weekends of January 8 and 14, 1989.

A number of alibi witnesses testified for the defense regarding weekends in January and February of 1989. Cathy Cato, an old friend of the defendant, testified that she was at the defendant's house from 3 p.m. to 7:30 p.m. on Saturday, December 31, 1988, and she did not see the complainant. Vickie Burda, defendant's half-sister, gave essentially the same testimony as Cato.

Patricia Briddick, who dated the defendant from November of 1988 through the third week of January 1989, testified that she met the defendant at a bar on Saturday night, December 31, and stayed at his house until 5 p.m. on Sunday, January 1. Briddick also met the defendant at the same bar on the following three Saturday nights, those being the 7th, 14th, and 21st of January 1989. On each of those nights she stayed at the defendant's house until the following Sunday. On none of those occasions, according to Briddick, was the complainant staying at the defendant's house. Briddick also testified that in the early morning hours of January 15, she and several other people went to the defendant's house for a party after the bar closed. Nancy Lorang, an acquaintance of the defendant, corroborated Briddick's testimony that the defendant

was at the bar on the 7th, 14th and 21st, and that there had been a party at the defendant's house on the 15th.

Michael Pluemer, the defendant's brother-in-law and the former owner of the painting company for which the defendant worked, testified that the defendant worked from 4 to 8 p.m. on Friday, January 13, in Marseilles, Illinois. Pluemer testified that he was with the defendant from 10 a.m. to 2 p.m. on Saturday, January 28, moving paint cans and storing them at the defendant's house. In addition, Pluemer stated that he and the defendant were together the following day, January 29, from 8:30 a.m. to 6:30 p.m., loading a U-Haul trailer. Pluemer testified that he did not see the complainant on these occasions.

Louella Kory, the defendant's mother, testified that on Sunday, January 22, 1989, she, the defendant, and other family members went to Iowa City, Iowa, at 1 p.m. and remained there until the following day. In addition, Kory testified that the defendant was at her home in Streator, Illinois, from 1 to 4 p.m. on Saturday, February 4, and from 10 a.m. on Sunday, February 12, until 10 a.m. the following morning.

Terry DeSalle, a co-worker of the defendant, testified that he usually went to the defendant's house at 8:15 a.m. and had a cup of coffee while the defendant finished getting ready for work. DeSalle testified to various dates that the defendant worked, including: January 7, until 11:30 a.m.; January 14, until 11 a.m.; January 21, until 2:30 p.m.; January 30; and February 4, until noon. DeSalle stated that he never saw the complainant on any of those dates.

Michelle Baker, the defendant's niece, testified that she lived at the defendant's house from November of 1988 until January of 1989, although she did not sleep there all the time. Baker testified that she moved out of the defendant's house on the weekend of January 7 and 8 and that the complainant was not there that weekend. Baker also testified that she never saw the complainant at the defendant's house the entire time that she lived there. Bob Besix, Baker's boyfriend, testified that he helped Baker move out of the defendant's house on the weekend of January 7 and 8 and he did not see the complainant.

Bonnie Pluemer, the defendant's sister, testified that the defendant left for Iowa City on Sunday, January 22, 1989, at about 1 p.m. and stayed there until the following day. Pluemer also stated that the defendant helped her and her husband move on the weekend of January 28 and 29, that she was in and out of the defendant's house on that weekend, and she did not see the complainant.

Gayle Anderson, another of defendant's sisters, testified that she cleaned the defendant's house on Monday, January 16, 1989, and there were pizza boxes and filled ashtrays indicating that there had been a party that weekend. Anderson also testified that the defendant went to Iowa City on January 22, 1989.

Regina Hawk, a childhood friend of the defendant, testified that she had attended a birthday party for the complainant in February of 1989. According to Hawk, the complainant told her that she loved the defendant and that she was going to live with him forever. In addition to their testimony about the defendant's whereabouts on various weekends in January and February of 1989, several witnesses testified that the defendant had a good reputation in the community for morality and decency.

Cathy Cannon, a former girlfriend of the defendant, also testified that the defendant's reputation for morality and decency was good. Cannon further testified that she lived with the defendant from June or July of 1986 through the fall of 1987. Cannon was living with the defendant when the complainant first came to visit on February 14, 1987, when she came up for three or four subsequent weekend visits between February and June of 1987, and when the complainant spent the summer of 1987 in Princeton. Cannon felt that the defendant was a good father who was concerned with his daughter's health, appearance, and study habits. Cannon testified that the complainant could not have been sleeping with her father because, except for the night of the victim's initial visit with defendant and one other night in June in 1987, she was sleeping with the defendant.

The defendant testified that he first met his daughter on February 14, 1987, at his nephew's wedding. Between then and the end of June, complainant visited the defendant and his girlfriend, Cathy Cannon, approximately every other weekend. Complainant then spent the summer of 1987 in Princeton with defendant and Cannon. The defendant denied having any sexual contact with complainant. Defendant testified that Cannon was living with him during this entire period of time and he was sleeping with her, not his daughter.

Defendant testified that after the summer of 1987, he saw complainant on several other occasions but she never spent the night alone with him and they had no sexual contact. Defendant further stated that he never saw the complainant in January of 1989.

The defendant also testified that after the complainant's visits began he resumed a relationship with complainant's mother, Cheryl, and spent some weekends at Cheryl and complainant's house. After

Easter of 1989, the defendant decided to end the relationship with Cheryl. Defendant and Cheryl subsequently had a fight over a tax refund check, after which defendant did not see complainant again. According to the defendant, in a fit of anger during the fight he told Cheryl that complainant was not his child. Cheryl subsequently told defendant, when he called to talk to complainant, that complainant did not want to talk to him because of what he had said.

The defendant also presented canceled checks he had written and cashed at a local bar dated January 6, 8, 14, and 21 of 1989. Following closing arguments and two days of deliberation, the jury returned a verdict of guilty.

■ The defendant first contends that he was not proved guilty beyond a reasonable doubt because the complainant's testimony was neither clear and convincing nor substantially corroborated. The State responds that the proper standard of review in sex crimes cases is that the judgment will be upheld when, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267). We note that the first (*People v. Stengel* (1991), 211 Ill. App. 3d 337, 570 N.E.2d 391; *People v. Byrd* (1990), 206 Ill. App. 3d 996, 565 N.E.2d 176), second (*People v. Nicholl* (1991), 210 Ill. App. 3d 1001, 569 N.E.2d 604; *In re A.J.H.* (1991), 210 Ill. App. 3d 65, 568 N.E.2d 964), fourth (*People v. Roy* (1990), 201 Ill. App. 3d 166, 558 N.E.2d 1208; *People v. James* (1990), 200 Ill. App. 3d 380, 558 N.E.2d 732), and fifth districts (*People v. Meador* (1991), 210 Ill. App. 3d 829, 568 N.E.2d 1386) have applied the *Collins* standard in reviewing convictions for sexual offenses, and we believe that a uniform standard of review in all criminal cases is preferable (see *People v. Pintos* (1989), 133 Ill. 2d 286, 294, 549 N.E.2d 344, 348 ("all claims of evidentiary insufficiency on review should be decided under a single standard") (Miller, J., specially concurring)). We hold, therefore, that *Collins* enunciates the proper standard of review applicable in all criminal cases, including sex offenses, where a defendant challenges the sufficiency of the evidence.

■ Defendant first claims that the complainant was inconsistent concerning when the first and last instances of sexual abuse occurred. The dates on which sexual abuse began and ended are collateral matters, however, and minor inconsistencies do not destroy a complainant's credibility. (*People v. Tannahill* (1987), 152 Ill. App. 3d 882, 504 N.E.2d 1283.) Defendant also points out that the com-

plainant's testimony that she never wanted to live with her father and never told anyone that she did was contradicted by other witnesses. Resolution of such conflicts in testimony is the province of the trier of fact, which is in a superior position to determine the credibility of the witnesses. *People v. Escobedo* (1986), 151 Ill. App. 3d 69, 502 N.E.2d 1263.

Defendant next contends that the conduct of the complainant in failing to report the sexual abuse until July of 1989 and in reinitiating contact with the defendant in January of 1989 after having allegedly been abused by him in 1987 casts doubt on the truthfulness of the complainant's allegations. Failure by a young victim of sexual abuse to make a prompt complaint is excusable given the child's natural sense of shame, fear, guilt, and embarrassment. (*People v. Lybarger* (1990), 198 Ill. App. 3d 700, 555 N.E.2d 1264; *Escobedo*, 151 Ill. App. 3d 69, 502 N.E.2d 1263.) We believe that such a delay in reporting sexual abuse is particularly understandable where, as here, the victim and the abuser are closely related. Similarly, we believe that the complainant's age and relationship with her father, along with her expressed hope that "he would change," adequately explained why she contacted the defendant even though he had abused her in the past.

The defendant further notes that the complainant testified that she told a school friend about the sexual abuse which occurred prior to January of 1989 and argues that the prosecution's failure to call the friend as a witness constitutes a fatal weakness in the State's case. We do not agree. In general, the State has no obligation to call all witnesses to a crime. (*People v. Carruthers* (1974), 18 Ill. App. 3d 255, 309 N.E.2d 659.) In this case the State presented the testimony of the complainant's mother, child abuse investigator Pat Elmore, and Officer Gary Swanson to corroborate the complainant's testimony. Additional corroboration by complainant's school friend was unnecessary, particularly since it would not relate to any abuse which occurred in January of 1989.

Finally, the defendant contends that the complainant "arguably had a motive to lie" because she may have been upset over defendant's decision to break off his relationship with complainant's mother or by defendant's statement that the complainant was not his daughter. Whether or not the complainant had a motive to lie, and more importantly, whether she was in fact lying or telling the truth, was a decision which the jury, which saw and heard the witnesses, was in the best position to make. (See *People v. Evans* (1990), 199 Ill. App. 3d 330, 556 N.E.2d 904.) The complainant's

testimony concerning the acts of sexual abuse was highly detailed, straightforward and consistent. Her identification of the defendant as the person who committed those acts was unwavering. Based on our review of the record we find that the defendant was proved guilty beyond a reasonable doubt. See *Lybarger*, 198 Ill. App. 3d 700, 555 N.E.2d 1264; *Escobedo*, 151 Ill. App. 3d 69, 502 N.E.2d 1263.

The defendant next maintains that he was denied a fair trial because he was not allowed to have his expert witness examine the complainant. Prior to trial, defendant sought an order compelling the complainant to undergo a mental examination, arguing that such an examination was necessary to enable him to counter the testimony of the State's rape trauma syndrome expert. Alternatively, defendant's motion sought to bar the rape trauma syndrome testimony. The trial court denied defendant's motion, relying on sections 115—7.1 and 115—7.2 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, pars. 115—7.1, 115—7.2).

The defendant acknowledges that section 115—7.1 prohibits a court from ordering a victim of sexual abuse to undergo a mental examination except where explicitly authorized by the Criminal Code or by supreme court rule. Defendant also recognizes that section 115—7.2 authorizes the admission of expert testimony relating to rape trauma syndrome. Defendant disclaims any attack on the validity of these statutory sections, but instead argues that the application of these sections deprived him of a fair trial because the State's expert was allowed to interview the complainant and testify that she exhibited symptoms consistent with rape trauma syndrome, while the defendant was prevented from countering the State's evidence with testimony from his own expert witness.

■ We agree with the defendant that the operation of sections 115—7.1 and 115—7.2, although perhaps unintended, tends to favor the prosecution and limits the defendant's ability to refute the State's rape trauma syndrome testimony. After a thorough review of the record, however, we are convinced that the defendant was not deprived of a fair trial by his inability to rebut the State's evidence regarding rape trauma syndrome. We agree with defendant's statement in his brief that the testimony of Pamela Klein, the rape trauma syndrome expert, "was not especially probative *** given her admissions that the symptoms comprising rape trauma syndrome were also found in other psychological syndromes and that she based her conclusion solely on her interview with [the complainant] despite the opinions of experts that a determination of sexual

abuse should be corroborated by other evidence or sources." A conviction will not be reversed where it does not appear that justice has been denied or that a finding of guilt resulted from an error. (*People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612; *People v. Wheeler* (1990), 194 Ill. App. 3d 178, 550 N.E.2d 1170.) In light of the complainant's detailed, clear, and convincing testimony of sexual abuse, we find that Klein's testimony added little to the State's case and that any error in admitting it or in preventing the defendant from refuting it did not affect the outcome of the trial and was harmless beyond a reasonable doubt.

■ Defendant next contends that the trial court erred in granting the State's motion *in limine* preventing the defendant from presenting the testimony of two psychologists that he did not possess traits consistent with those of a pedophile. By presenting this testimony, the defendant sought to counter the testimony of the State's rape trauma syndrome expert by showing that his personality traits were inconsistent with those of persons who sexually abuse children. While a defendant may introduce evidence to establish that his character traits are inconsistent with committing the crime with which he is charged, this must be shown only by evidence of general reputation and not by the personal opinion of the witness. (*People v. Flax* (1986), 147 Ill. App. 3d 943, 498 N.E.2d 667; *People v. Flemming* (1977), 47 Ill. App. 3d 755, 362 N.E.2d 691; see M. Graham, Cleary & Graham's Handbook of Illinois Evidence §405.2, at 205-06 (5th ed. 1990).) We find no error by the trial court in barring the testimony of the psychologists.

The defendant next maintains that the following jury instruction deprived him of a fair trial:

"The indictment states that the offense charged was committed on or about January 14, 1989. If you find the offense charged was committed, the State is not required to prove that it was committed on [or about] the particular date charged." Illinois Pattern Jury Instructions, Criminal, No. 3.01 (2d ed. 1981)(hereinafter IPI Criminal 2d No. 3.01).

Defendant points out that the prosecutor told the jury in his opening statement that the evidence would show that the offense occurred in January of 1989, thereby "voluntarily assuming" that burden and misleading the defendant in preparing his alibi defense. Defendant further notes that during closing argument the prosecutor "ridiculed" the defendant's alibi defense, referring to it as "this well constructed, minute by minute, hour by hour alibi for the month of January," and later told the jurors to ask themselves if

they "could go back to January, February and March of 1989 and reconstruct your life minute by minute, hour by hour. I mean, wasn't that a little much[?]"

■■ ■ It has long been the general rule in Illinois that proof of the precise date alleged in an indictment is unnecessary unless the allegation of a particular time is an essential ingredient of the offense or a statute of limitations question is involved. (*People v. Alexander* (1982), 93 Ill. 2d 73, 442 N.E.2d 887; *People v. Patrick* (1967), 38 Ill. 2d 255, 230 N.E.2d 843; *People v. Taylor* (1945), 391 Ill. 11, 62 N.E.2d 683; *People v. Kircher* (1928), 333 Ill. 200, 164 N.E. 150; *People v. Burton* (1990), 201 Ill. App. 3d 116, 558 N.E.2d 1369; *People v. Baugh* (1986), 145 Ill. App. 3d 133, 495 N.E.2d 688; *People v. Riddle* (1986), 141 Ill. App. 3d 97, 489 N.E.2d 1176; *People v. Long* (1977), 55 Ill. App. 3d 764, 370 N.E.2d 1315.) Based on this rule, it has been held that it is proper to instruct the jury that the prosecution need not prove that the offense occurred on the date charged in the indictment. (*People v. Robinson* (1958), 14 Ill. 2d 325, 153 N.E.2d 65; *People v. Vaughn* (1945), 390 Ill. 360, 61 N.E.2d 546; *People v. Olroyd* (1929), 335 Ill. 61, 166 N.E. 462; *People v. Barlow* (1989), 188 Ill. App. 3d 393, 544 N.E.2d 947; *People v. Cregar* (1988), 172 Ill. App. 3d 807, 526 N.E.2d 1376; *People v. Neumann* (1979), 76 Ill. App. 3d 112, 394 N.E.2d 901.) Notwithstanding the authorities cited above, we believe that giving IPI Criminal 2d No. 3.01 may result in reversible error where the inconsistencies between the date charged in the indictment and the evidence presented at trial is so great that the defendant is misled in presenting his defense or when he presents an alibi for the time alleged in the indictment and is thereby prejudiced because he failed to gather evidence and witnesses for the time actually proved by the State. See *Kircher*, 333 Ill. 200, 164 N.E. 150; *People v. Escobedo* (1986), 151 Ill. App. 3d 69, 502 N.E.2d 1263; *People v. Eng* (1985), 138 Ill. App. 3d 281, 485 N.E.2d 1222; *People v. Steele* (1984), 124 Ill. App. 3d 761, 464 N.E.2d 788; *People v. Noll* (1982), 109 Ill. App. 3d 306, 440 N.E.2d 335.

■■ In this case we find that the defendant suffered no prejudice. The evidence presented to the jury showed that the sexual abuse occurred sometime in January of 1989 or when the complainant was visiting the defendant in 1987. The defendant presented alibi witnesses for January of 1989 and also presented the testimony of Cathy Cannon that she lived with the defendant in 1987 and that no sexual abuse could have occurred during that period. Defendant was therefore not prevented from presenting an alibi defense.

Moreover, it is clear that the essence of defendant's defense was that he *never* sexually abused the complainant, not merely that he could not have abused her in January of 1989. The jury rejected that defense, and under the circumstances, we find no error in giving IPI Criminal 2d No. 3.01.

▌ Finally, the defendant cites to numerous comments by the prosecutor in his opening statement and in his closing and rebuttal arguments which defendant claims deprived him of a fair trial. The State responds that the defendant has waived any alleged errors because he only objected to a single statement by the prosecutor and failed to include the objection in his post-trial motion. A defendant must ordinarily object to an error at trial and include the objection in a post-trial motion to preserve it for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) However, where the evidence is closely balanced or where the error adversely affected the defendant's right to a fair trial, errors which have not been properly preserved may be reviewed under the plain error rule. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) Given the complainant's clear and detailed testimony, we are unable to say that the evidence in this case was closely balanced. We will therefore examine the prosecutor's statements to determine whether they were so seriously prejudicial that the defendant was denied a fair trial. In so doing we are mindful of the fact that, as is often true in cases of this nature, the verdict was necessarily based upon the jury's determination of the credibility of the witnesses, particularly that of the complainant and the defendant.

▌ Defendant first argues that the prosecutor improperly bolstered the credibility of the State's witnesses by investing them with the authority of his office. According to defendant, this began in the prosecutor's opening statement when he introduced Princeton police officer Gary Swanson and Janelle Beltramini, director of the Child Protection Services Division of the Bureau County State's Attorney's office, both of whom were sitting at the prosecutor's table, and told the jury that "we are all working together in this case." The prosecutor then told the jury that Pat Elmore from the Iowa Department of Human Services investigated a report of sexual abuse and then "did what she is suppose [*sic*] to do" by notifying "all of us," which led to an investigation by the Princeton police department, the Department of Children and Family Services, and the State's Attorney's office. The prosecutor also told the jury that rape trauma syndrome expert Pamela Klein was retained "by [his] office" to examine the complainant and "she's qualified."

An opening statement in a criminal trial should be an outline of the facts which each party expects to prove. (*People v. Coleman* (1989), 187 Ill. App. 3d 541, 543 N.E.2d 555.) The prosecutor's introduction of Swanson and Beltramini and his statement that they were all working together merely stated the obvious and was not prejudicial. The references to Elmore and Klein simply provided factual details which were later proved at trial. With respect to Elmore, the prosecutor simply outlined what her responsibilities were once the report of sexual abuse had been received by the Iowa Department of Human Services. Similarly, informing the jury that Klein had been retained by the prosecutor's office to conduct an examination of the complainant and that Klein was qualified were facts that the State intended to and did prove at trial. Informing the jury of the steps in the investigation of a crime is not improper (*People v. Graham* (1985), 132 Ill. App. 3d 673, 477 N.E.2d 1342), and we find no error.

The defendant also contends that it was improper for the prosecutor to refer to Swanson, Beltramini and himself as "we," to thank the jury "on behalf of myself as the State's Attorney [*sic*] of Bureau County, and on behalf of Officer Swanson and Mrs. Beltramini and [the complainant] and her mother," and to ask the jury to return a verdict "on behalf of Gary Swanson and the Princeton Police Department, the Illinois Department of Children & Family Services, the Iowa Department of Human Services, on behalf of Mrs. Beltramini *** and finally on behalf of myself." The defendant contends that these comments invested the witnesses with the authority of the State's Attorney's office and improperly bolstered their testimony, citing *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256. In *Bitakis*, however, the prosecutor pledged his personal reputation that a State's witness was not a false one and gave his opinion of her veracity. In this case, the comments of the prosecutor complained of by the defendant did not have a similar effect and we find no error.

Defendant next complains that it was improper for the prosecutor to tell the jury during his opening statement that the complainant would testify about being abused "if she can get through it" and to state during closing argument that a child can't be taught to lie about sexual abuse "in front of a packed courtroom." We find nothing improper about the former comment, and the latter statement was merely a comment on the demeanor of the witness and was in response to the suggestion of the defendant's attorney dur-

ing cross-examination that the complainant's testimony was rehearsed. We find no error.

Defendant next extracts nine phrases from the prosecutor's closing argument which he maintains improperly invaded the province of the jury in deciding whether the complainant was a credible witness. Some of these are: "[s]he knows it happened"; "[t]his kid is not lying"; "what you heard here was the truth"; "she is not" lying; and "there is nothing so powerful as the truth as told from a child." We have examined these remarks in context (see *People v. Emerson* (1987), 122 Ill. 2d 411, 522 N.E.2d 1109), and we find them to be within the wide latitude granted to a prosecutor in closing argument (*People v. Newell* (1990), 196 Ill. App. 3d 373, 553 N.E.2d 722). For example, the first comment about which defendant complains was made in the context of explaining the problem that the complainant had in pinpointing when the sexual abuse occurred.

> "I don't know which of you or any of you have had traumatic events in your life, but if you call upon your experiences and observations in life, you remember those, every little detail, like you're watching a movie. You can relate them back time and time again if they happen. You might not be able to say when you're ten years old or even twenty [years] old or thirty years old, when it happened. And there was all kinds of confusion in this case as to when it happened. There is no question about it, Mr. Telford demonstrated that very well I thought about [the complainant] when he tried to use the blackboard. *** She is ten years old, she has no idea when it happened. She knows it happened, when it happened, maybe your guess is as good as mine."

Another of the comments placed in context was:

> "I [would] suggest to you respectfully that her confusion on collateral matters, whether [it] was January or August, she didn't know the difference between January and August, those kinds of things show what you heard here was the truth because those things would have been nailed down but good *** ."

Many of the remaining remarks were made in the context of asking the jury to consider the reasonableness of different aspects of the complainant's testimony. During closing argument a prosecutor may properly comment on the credibility of witnesses (*People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612; *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301), including the credi-

bility of the complainant (*People v. Tannahill* (1987), 152 Ill. App. 3d 882, 504 N.E.2d 1283). Overall we find that the statements were permissible comments on the evidence or reasonable inferences drawn from the evidence. We find no error.

Defendant next points to four comments in which he claims that the prosecutor presented his own testimony to the jury and expressed his personal belief in the defendant's guilt. Again, when these excerpts are placed in context, we do not find them to exceed the bounds of proper argument. For example, defendant cites the prosecutor's statement that "children do not lie and fantasize about their father sexually molesting them" as error. However, preceding that remark the prosecutor stated:

> "[A]sk yourself, is it reasonable, is it reasonable to believe that this girl and her mother concocted all of this[?] *** I would submit, Ladies and Gentlemen, that conclusion just isn't raesonable [*sic*] to believe that. I mean, think about that, calling upon your experience and observations in life. What children lie about and what they don't lie about. What they fantasize and what they don't fantasize. Ladies and Gentlemen, children do not lie and fantasize about their fathers sexually molesting them."

Obviously the prosecutor was not expressing his personal belief in the defendant's guilt but was asking the jury to rely on their own experience in judging the complainant's credibility. We will not lengthen this opinion by relating the other three comments complained of, but we have examined them and find no error.

The defendant next argues that the prosecutor "attacked the veracity of some of defendant's alibi witnesses and chastised trial defense counsel for orchestrating a false alibi." A prosecutor may comment on the credibility of defense witnesses (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 484 N.E.2d 329), and merely questioning the validity and believability of defendant's alibi is not improper (*People v. Mitchell* (1990), 200 Ill. App. 3d 969, 558 N.E.2d 559). We have examined the comments cited by the defendant and we find no error.

Defendant also contends that the prosecutor improperly commented on the defendant's failure to produce a witness. Such a comment is permissible where, as here, it was made in response to defense counsel's own reference to the State's failure to call the witness. *Richardson*, 123 Ill. 2d 322, 528 N.E.2d 612; *People v. Boone* (1988), 180 Ill. App. 3d 98, 534 N.E.2d 1266.

Finally, defendant maintains that portions of the prosecutor's closing and rebuttal arguments were calculated to arouse the prejudices and inflame the passions of the jury. The defendant complains of the following statements:

"You can send a loud and clear message with the guilty verdict that child abusers and their perverted and immoral and legal [sic] conduct will not be tolerated under any circumstances in this county. You know, that message can send forth a notice that laws that we have in this State protecting our young people from incest and from all forms of abuse will be fearlessly and fully enforced by juries in this county. That's the notice that you can send. And you can tell children that their forthrightness, their honesty, their willingness to carry through on the trauma that goes along, will be believed. That's what you can tell children all over, that it will be believed. And that they will be free from their abusers. Ladies and Gentlemen, I suggest to you that because the evidence proves guilt beyond a reasonable doubt that a not guilty verdict will send an exact opposite message to children. It will tell them you can't come forward, you can't withstand repeated interviews and examination by professionals and you can't come into court and withstand cross examiantion [sic] because that's not enough to be believed. That's what a not guilty verdict will send."

In his rebuttal argument the prosecutor further stated:

"[W]hen you deliver your verdict, you are the conscience of Bureau County. You are the conscience of our community. And, Ladies and Gentlemen, because the proof has shown beyond a reasonable doubt, beyond a reasonable doubt, because that's true, I suggest that you must uphold the law and you must send those messages and notices by returning a guilty verdict. It's time for the people, the people to have their rights. You know, you are in a unique posiiton [sic] to do that. You know, the people have a right, children have a right, everywhere and particularly where we are concerned here in Bureau County to live free of this. Not only the victims, but the rest of us. We have a right to demand that children do not suffer through this. Anything less than a guilty verdict, Ladies and Gentlemen, would be an injustice for the people and for children, not to mention [the complainant], but children everywhere."

It is not improper for the prosecutor in closing arguments to denounce the accused, dwell upon the evil results of crime, and urge the fearless administration of the law. (*People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357; *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301; *People v. Evans* (1988), 173 Ill. App. 3d 186, 527 N.E.2d 448; *People v. Petty* (1987), 160 Ill. App. 3d 207, 513 N.E.2d 486.) While we believe that some of the prosecutor's statements unnecessarily appealed to the jurors' emotions, we find no substantial error, nor do we find that the cumulative impact of any of the errors alleged by the defendant deprived him of a fair trial.

For all the reasons stated above, we affirm the judgment of the circuit court of Bureau County.

Affirmed.

GORMAN, J., concurs.

PRESIDING JUSTICE STOUDER, dissenting:

Respectfully, I must dissent.

It is well-established that a criminal defendant's right to present witnesses in his defense is a fundamental right guaranteed by the compulsory process clause of the sixth amendment to the Federal Constitution. (See U.S. Const., amend. VI; *Taylor v. Illinois* (1988), 484 U.S. 400, 98 L. Ed. 2d 798, 108 S. Ct. 646.) Section 115—7.1 of the Code of Criminal Procedure of 1963 (Code) provides in relevant part that no court may require or order a witness who is the victim of an alleged sex offense to submit to or undergo either a psychiatric or psychological examination. (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.1.) The purpose of this statute is to prevent defense attorneys from harassing complainants by forcing them to submit to such an examination in order for the defense to attempt to attack a complainant's credibility or competency to testify at trial. In the instant case, however, the majority's application of the statute leads to an unjust and unreasonable result unintended by the legislature.

In ascertaining the legislature's intention, the entire statute must be considered, as well as the evil to be remedied and the object to be attained. (*People v. Jones* (1985), 134 Ill. App. 3d 1048, 481 N.E.2d 726.) Those cases interpreting this statute have applied it primarily to the issue of whether the complainant was competent to testify at trial. In contrast, the majority here interprets the stat-

ute as allowing the State to examine a complainant for symptoms of rape trauma syndrome, and, when such symptoms are found, to close off any attempt by the defendant to have an expert likewise examine the complainant. As such, it would be an unjust result to allow the State to open the door to such testimony and still retain the ability to shut the door on any subsequent attempt by the defendant to counter such testimony.

Furthermore, in the instant case, the defendant did not request to have his expert examine the complainant for purposes of showing that she is incompetent to testify at trial. Rather, the basis of the defendant's request is to allow for the possibility of impeaching the testimony of the State's expert witness regarding rape trauma syndrome. Thus, in stark contrast to those cases interpreting section 115—7.1, the defendant's actions in the instant case cannot be described as a matter of harassing the complainant. Therefore, I find the trial court's reliance on the above-mentioned statute to be misplaced.

Moreover, the Indiana Supreme Court recently addressed a similar issue in *Henson v. State* (Ind. 1989), 535 N.E.2d 1189. In *Henson*, the court reversed the defendant's sexual-offense convictions and remanded the case for a new trial due to the trial court's denial of the defendant's attempt to use expert testimony to show that the complainant's conduct was inconsistent with rape trauma syndrome. The court found that it would be fundamentally unfair to allow the use of rape trauma testimony by the State and then deny its use by a defendant. The court further found the trial court's ruling impinged upon the substantial rights of the defendant to even present a defense.

In addition, section 115—7.2 of the Code provides in relevant part that in a prosecution for an illegal sexual act perpetrated upon a victim, expert testimony by a behavioral psychologist, psychiatrist or physician relating to any recognized and accepted form of post-traumatic stress syndrome shall be admissible as evidence. (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.2.) If the State, following section 115—7.2, can interview a complainant for purposes of making a professional expert judgment as to whether she suffers from rape trauma syndrome, then certainly the defense should be allowed to make a similar examination of the complainant for this limited purpose. If the legislature meant for section 115—7.2 to be employed solely by the State, they could have said so.

I also disagree with the majority's application of the harmless error rule to this issue. Many jurisdictions recognize that testimony

about rape trauma syndrome is highly prejudicial because it tends to incriminate the defendant in the eyes of the jury by creating the inference that the complainant was raped. (See *People v. Taylor* (1990), 75 N.Y.2d 277, 552 N.E.2d 131; *State v. Black* (1987), 109 Wash. 2d 336, 745 P.2d 12; *People v. Bledsoe* (1984), 36 Cal. 3d 236, 681 P.2d 291, 203 Cal. Rptr. 450; *State v. Saldana* (Minn. 1982), 324 N.W.2d 227.) The instant case hinged upon the credibility of the witnesses. Unlike those cases cited by the majority, the record here does not include substantial or even minimal corroboration of the complainant's charges, and there was a long delay between the dates of these purported acts and the actual reporting of them to the authorities. Further, I find the complainant's testimony to be less than clear and convincing. It is significant, moreover, that the jury also considered the testimony of the State's witness regarding the complainant having the symptoms of rape trauma syndrome. In a close case such as this, considering the highly prejudicial nature of the expert testimony, it can hardly be considered harmless error to allow the State to present rape trauma syndrome testimony to the jury while denying the defendant the same opportunity. In addition, although the issue of the admissibility of rape trauma syndrome testimony was not presented, I find such testimony to be highly prejudicial. I agree with the substantial number of jurisdictions that refuse to allow such testimony to be presented at trial. The major import of such testimony is to significantly enhance the credibility of the complaining witness to such a degree that it takes away a primary function of the jury.

The trial is a truth-seeking vehicle rather than a forum for gamesmanship. (R. Ruebner, Illinois Criminal Procedure 245 (1987).) In the instant case, denying the defendant the opportunity to have an expert examine the complainant to possibly counter the rape trauma syndrome testimony does little to enhance the pursuit of truth in the courtroom and creates juror confusion at the expense of due process. Accordingly, due to the inherently prejudicial effect of the rape trauma testimony by the State's expert, I find the denial of the defendant's attempt to examine the complainant with one of his experts to be reversible error.

For these reasons, I must respectfully dissent.